Harmasse LeCLAIR and Elizabeth Le-Clair, Appellees-Cross-Appellants,

v.

William SAUNDERS,
Appellant-Cross-Appellee.

Nos. 1070, 1098, Dockets 79–7113, 79–7759.

United States Court of Appeals,
Second Circuit.

Argued April 25, 1980.

Decided July 10, 1980.

As Amended on Rehearing
Sept. 26, 1980.

Mitchell J. Sikora, Asst. Atty. Gen., Commonwealth of Massachusetts, Boston, Mass. (Gerald J. Caruso, Asst. Atty. Gen., of counsel), for appellant-cross-appellee.

Peter F. Langrock, Middlebury, Vt. (Susan F. Humphrey, Langrock, Sperry, Parker & Stahl, Middlebury, Vt., of counsel), for appellees-cross-appellants.

Before KAUFMAN, Chief Judge, OAKES, Circuit Judge, and TENNEY, District Judge.[*]

OAKES, Circuit Judge:

A dairy farm inspector employed by the Commonwealth of Massachusetts, William Saunders, appeals from an adverse judgment in an action under 42 U.S.C. § 1983 alleging a violation of equal protection of the laws, brought by appellees Harmasse ("Red") and Elizabeth LeClair, owners of a Vermont dairy farm. Following a two-day jury trial in the United States District Court for the District of Vermont, before Albert W. Coffrin, Judge, the jury returned a verdict for the LeClairs and awarded damages of $44,152. The district court sub-sequently ordered a partial new trial on the damages, which produced a lesser award of $39,375. Saunders appeals from the original verdict and from the second damage award. The LeClairs cross-appeal from the court's original order for a partial new trial on the damages and from denial of costs and attorneys' fees. Because the evidence was insufficient to support a finding of a violation of equal protection, we reverse.

## FACTS

Massachusetts requires that all dairy farms shipping milk into and within the Commonwealth pass an annual inspection to guarantee sanitary conditions. To this end, the Commonwealth employs a group of inspectors that covers New England and upper New York state. In the mid-1960s, Massachusetts adopted a policy designed to upgrade the quality of farm water supplies. In 1967, the Massachusetts Milk Regulation Board promulgated regulations to govern farm inspections that required farm water supplies to be "easily accessible, adequate, and of a safe sanitary quality," so as to assure safe water for cleansing milk storage tanks and utensils. Only water supplies coming from municipal systems or covered and protected private supplies such as deep wells were mentioned as acceptable under the regulation. Because many farmers had only unprotected water sources, and because conversion to approved water sources was in some cases costly or infeasible, the policy was only gradually enforced.

Appellees own a 235-acre, 50-cow dairy farm in Charlotte, Vermont, which appellant had been inspecting since around 1950. By 1975, out of the 1,200 farms within Saunders' territory, only 10 or 11 remained without an approved water source. These included the LeClair farm, which used an unprotected and sometimes visibly dirty open pond as the water supply to its milk room. Since adoption of the new policy

---

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

around 1965, Saunders had suspended many farms for lack of satisfactory water supplies. This was true despite the fact that in the area it was often difficult to obtain water by drilling.

Beginning in 1971, Saunders wrote at least annually in his "Dairy Farm Inspection Reports" on the LeClair farm that they should "provide protected water supply for milk room," although he nevertheless continued to approve the farm for milk shipment to Massachusetts. During the April 9, 1975 inspection visit to the farm, Mr. LeClair told Saunders about an existing 600' deep drilled well, but stated that it probably had insufficient water to supply the milk room. Saunders urged Mr. LeClair to connect it, indicated that he was not approved for the following year, and said that another inspection would occur within a month. Saunders did not return until December 23, 1975, seven days before farm approval was needed to ship milk in 1976. He had heard from an H. P. Hood field inspector in the intervening months that Mr. LeClair had not hooked up the well, although he had had a well-digger look at it. Saunders, upon confirming this for himself, disapproved the farm and left an inspection report stating: "provide a protected safe water supply for milk room use. No further delays allowed on this problem." Mr. LeClair, who had not been present during this inspection, subsequently received a letter on January 14, 1976 officially suspending his farm. The LeClairs' attorney then sent Saunders a letter in late February, suggesting that this clients had been the victim of inequitable treatment and requesting an immediate reinspection. Saunders, with another inspector, returned to the farm on March 12, 1976, gave it an unusually detailed inspection, and still declined to give approval. Since that time, the LeClairs have not shipped milk to Massachusetts and for all practical purposes are out of business.

## DISCUSSION

██ This case is lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply. Appellees do not allege an unconstitutional state statute or regulation that impermissibly classifies dairy farms into different categories. If they had done so, such a claim would have almost certainly failed. Economic regulation concerned with public health is squarely within the state's police power, and any classification of water supplies and farms not wholly irrational thus would be proper. Moreover, equal protection does not require that all evils of the same genus be eradicated or none at all. *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109–10, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). Instead appellees' charge boils down to one of selective enforcement or prosecution by a state official pursuant to a lawful state regulation. The claim is that of the ten or eleven farms with unprotected water supplies only two were suspended and the one other than the LeClairs' was quickly reinstated.

██ The doctrine of immunity and the law of equal protection intersect in determining whether appellant is liable for damages in this § 1983 action. Mere failure to prosecute other offenders is not a basis for a finding of denial of equal protection. *United States v. Rickenbacker*, 309 F.2d 462 (2d Cir. 1962), *cert. denied*, 371 U.S. 962, 83 S.Ct. 542, 9 L.Ed.2d 509 (1963). So too is appellant entitled to some degree of qualified immunity as an executive official for acts performed in the course of official conduct. *Gomez v. Toledo*, —— U.S. ——, ——, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). Given his responsibilities as an inspector who makes decisions necessarily affecting the economic well-being of farmers, Saunders must have the confidence to "call them as he sees them," and therefore should be shielded, for reasonable mistakes, from damage actions brought by unhappy farmers. *See Wood v. Strickland*, 420 U.S. 308, 319–20, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). At the same time, whatever protection is provided should not extend to the

point where Saunders may operate with unbridled discretion, approving or suspending farmers by whim or caprice. *Wood v. Strickland, supra,* describes the scope of immunity in the school context: an official

> is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*Id.* at 322, 95 S.Ct. at 1001. The Court there suggested an inquiry into whether the official

> has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

*Id. Wood* appears to propose, then, a test containing two independent parts: did the official, with subjective or objective knowledge, violate a person's constitutional rights, or did the official act with malicious intent to injure the person in some "nonconstitutional" sense? We think the *Wood* standard of qualified immunity is appropriate for an official operating in appellant's capacity.

As suggested earlier, the case law dealing with § 1983 actions alleging selective treatment is sparse. In *Moss v. Hornig,* 314 F.2d 89 (2d Cir. 1963), the case perhaps most closely on point, Moss brought a § 1983 action against a state official for selectively enforcing Sunday business closing laws only against Moss. The court held that "[t]o show that unequal administration of a state statute offends the equal protection clause one must show an intentional or purposeful discrimination." *Id.* at 92; *see Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). But the bare bones of the phrase "intentional and purposeful discrimination" are an insufficient guide to judge liability in this context. Under appellees'

suggested interpretation, if Saunders intended to suspend the LeClairs, which he clearly did, and his purpose was to prevent them from shipping milk to Massachusetts, which it clearly was, then he would be guilty of discrimination. This result would be so overinclusive as to be unworkable, let alone unfair.

Although not precisely on point, cases involving the criminal defense of selective prosecution provide a useful analogy. In *United States v. Berrios,* 501 F.2d 1207 (2d Cir. 1974), the court held:

> To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as "intentional and purposeful discrimination."

*Id.* at 1211 (citations omitted); *see United States v. Kahl,* 583 F.2d 1351, 1353 (5th Cir. 1978); *United States v. Scott,* 521 F.2d 1188, 1195 (9th Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *United States v. Ortega-Alvarez,* 506 F.2d 455, 458 (2d Cir. 1974) (per curiam), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975).

■ Drawing from the above standards articulated in *Moss* and *Berrios* as well as from the immunity inquiry outlined in *Wood,* we believe that liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith in-

tent .to injure a person.[1]  *Cf. Moran v. Bench*, 353 F.2d 193, 194 (1st Cir.), *cert. denied*, 384 U.S. 906, 84 S.Ct. 1341, 16 L.Ed.2d 359 (1965) (§ 1983 action brought against state motor vehicle officials involving suspension of a license) ("[I]f defendants employed their official powers for the purpose of injuring the plaintiff, rather than to serve the proper ends of their governmental duties, plaintiff might well have a claim under the civil rights statutes.")

In determining whether the evidence here was sufficient to survive a motion for directed verdict, we must decide whether the record as a whole would allow a reasonable jury to reach a verdict against the moving party.  *Gehrhardt v. General Motors Corp.*, 581 F.2d 7, 14 (2d Cir. 1978); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).  On the record as a whole, we find that the LeClairs failed to prove an equal protection violation by Saunders adequate to survive a directed verdict.[2]  In support of the "selective treatment" prong of the test, the LeClairs presented evidence showing that their farm was excluded while ten or eleven others with similar types of unprotected water supplies were not.  Although appellant maintains that appellees' well made their farm dissimilar from the others, the jury may have credited Mr. LeClair's testimony that the well was inadequate for milk room use—and thus not a viable alternative water source—and that he told Saunders it was a dry well.

■  But we need not decide whether appellees satisfied the first part of the test, since even assuming arguendo that they did, they nevertheless failed to proffer suf-

ficient evidence supporting the second.  The LeClairs never alleged that they were excluded because of their race, nationality, *cf. Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886), religion, or other invidious reasons, or to prevent them from exercising, for example, their First Amendment right of free speech or any other constitutional right.  Appellees' claim, then, must rest on proof of Saunders' malicious or bad faith intent to injure the LeClairs through selective treatment of their farm.  Although appellees alleged malice in their complaint, the evidence presented at trial does not support such a finding.  Their evidence consisted of the following six elements: (1) that the other 10 or 11 farms were treated differently from the LeClairs'; (2) that Saunders wanted appellees to connect the well without knowing it was adequate; (3) that Saunders knew about the well in 1970 or 1971, but only suddenly in 1975 decided to push them to connect it; (4) that Saunders intentionally appeared at the end of 1975 so as to make it impossible for them to meet the deadline for approval; (5) that Saunders was in a spiteful mood at the time of the December, 1975 inspection because he had had a run-in earlier in the day with another farmer; and (6) that the March, 1976 special reinspection was unusually meticulous and detailed.

None of the six elements directly shows malice, and each is too attenuated to provide adequate inferences of it.  Taking the evidence in the light most favorable to appellees, and even viewing the six elements collectively, there was no showing that Saunders maliciously or in bad faith wanted to hurt appellees.  The first two, the "different treatment" and "well might be inad-

---

1.  We leave open the question whether an official who claims that his intent to injure was benign but which under any objective measure would not be found so may be held liable.  For example, had Saunders testified that he fully intended to hurt the LeClairs but only because he thought Mr. LeClair would mature as a human being when faced with economic adversity, we would need to decide whether such subjective belief would insulate Saunders from a finding of malicious or bad faith intent.

2.  It is quite clear that qualified immunity is irrelevant to the existence of a cause of action under § 1983, since it operates only as a defense available to the official in question.  *Gomez v. Toledo*, —— U.S. ——, ——, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980).  However, on the basis of all the evidence here, Saunders' cloak of qualified immunity has not been pierced.

equate" claims, do not in themselves show malice. Nor does the fact that Saunders waited until 1975 to exclude the LeClairs, since he had been warning them about the water supply problem since 1971; if anything this shows that he had been very lenient. And appellant hardly surprised the LeClairs by appearing at the end of the year in 1975. On his December, 1974 inspection report, Saunders had written *"Last Request. Provide protected source of water for milk room use."* In April, 1975, he told LeClair to connect up the drilled well, and although he indicated he would reinspect in one month, the very fact that he next appeared in December does not presumptively illustrate malice. Apparently a Hood milk inspector had told Saunders in the intervening months that appellees had not yet hooked up the well, so there was no reason for appellant to visit until the time to approve or disapprove came near.

The final two elements come closer to showing malice or bad faith, but are still insufficient. That Saunders was mad at another farmer several hours before the December, 1975 inspection does not prove malice toward Mr. LeClair himself. Whether the other farmer was treated fairly or not is not at issue in this case, except to the extent that it reflects on Saunders' treatment of appellees. While the detailed inspection in March, 1976 by Saunders and another inspector was probably unusual in its rigor, and may show some antagonism toward Mr. LeClair following receipt of his lawyer's February letter, it does not show malice at the time of the original suspension in December.

As a general matter, Mr. LeClair testified that there had never been any anger between him and Saunders during their over 25 years of dealings. The regulations guiding farm inspectors with accompanying explanation were to the effect that unprotected and uncovered sources were unsatisfactory; while filtration and chlorination of such supplies had been permitted for a period of time in the past, Mr. LeClair had been repeatedly warned that his pond as a source for water supply to the milk room was unsatisfactory. Saunders was clearly authorized, then, in his official capacity, to ensure compliance with these regulations by reporting offenders to his superiors. Even if the LeClairs did not have a well at all, Saunders would be able to move against them first among the remaining ten or eleven noncomplying farms without violating the equal protection clause. After all, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," as long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962).

As a general matter, the equal protection clause serves to protect suspect classes and fundamental interests against inequitable treatment, but other types of inequities and classifications may be justified by a showing of mere rationality. *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). As Judge Skelly Wright recently stated, "The key here is that the equal protection clause is primarily concerned with classes or groups, not individuals. As I am confident Mr. Justice Frankfurter must have written somewhere, a case invoking the equal protection clause, if it is to succeed, must allege something more than a tort, personal to the plaintiff." Wright, J., *Judicial Review and the Equal Protection Clause*, 15 Harv. C.R.–C.L. L. Rev. 1, 27 (1980). In this case, where no invidious discrimination or interference with the exercise of other express constitutional rights has occurred, the malice/bad faith standard should be scrupulously met. If Saunders went after Mr. LeClair to *get him*, for any reason, then he should be liable. But we do not believe the evidence in this case can support such a conclusion.

Reversed.

### ORDER ON PETITION FOR REHEARING

Appellees-cross-appellants Harmasse LeClair and Elizabeth LeClair have filed a petition for rehearing. The petition correctly states that the 1965 memorandum

from the director of the Division of Dairying and Animal Husbandry mentioned at slip op. 4303 and referred to at slip op. 4312 was excluded from the evidence. Unfortunately Defendant's Exhibit L without indication that it was only for identification was printed in the appendix at A390 and we omitted to note the court's ruling excluding it contained just before the close of the defense case at A269. However, the omission from evidence of the 1965 memorandum does not affect the result in the case. The 1967 Massachusetts Milk Board's regulations governing farm inspections required farm water supplies to be "easily accessible, adequate and of a safe sanitary quality" so as to insure safe water for cleansing milk storage tanks and utensils. Properly covered and protected private supplies such as deep wells or springs were mentioned as acceptable in the explanation of the regulation as set forth in Defendant's Exhibit K which was admitted at the same time Exhibit L was excluded.

It is true that the same explanation is relied upon by appellees-cross-appellants on the basis that it states that "the quality of the water shall be determined by analysis of the State Board of Health of the state in which such water supply is located, or other qualified laboratory." They point out that in fact in February of 1976 they did not obtain a state water certificate in respect to their pond. But this does not indicate that the pond was "properly covered over and protected from all possible sources of contamination" as the explanation to regulation required. We read, and we think appellant Saunders could reasonably have read, the reference to certification of the quality of the water to relate to private supplies (including wells, springs, artesian wells, or other sources) "properly covered over and protected from all possible sources of contamination," not to open ponds. Thus the LeClairs' water supply was not acceptable under the regulations as interpreted in the explanation.

Accordingly we have amended the original opinion.

We have examined the other points made in the petition for rehearing and consider that they are answered in the original opinion.