884 F.2d 1388
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
JETSTREAM AERO SERVICES, INC., Plaintiff-Appellant,
v.
NEW HANOVER COUNTY, Rudolph C. Shackleford, Jr., John E.
Nolan, G. Felix Cooper, Sky D. Conklin, Wilmington General
Aviation Industries, Inc. d/b/a Aeronautics, Air Wilmington,
Inc., Defendants-Appellees.
Claud O'Shield, Jr., Fred Retchin, Lawrence Murray, Robert
H. Goslee, Jr., Defendants.
 No. 88-1748.
 United States Court of Appeals, Fourth Circuit.
 Argued June 6, 1989.
Decided Aug. 15, 1989.
Rehearing Denied Sept. 8, 1989.
 
 Noel Lee Allen (Paul C. Ridgeway, M. Annette Rhodes, Allen & Pinnix on brief) for appellant.
 Don F. Lively (Womble, Carlyle, Sandridge & Rice on brief), John Dearman Martin (Lonnie B. Williams, Marshall, Williams, Gorham & Brawley, Carlton S. Prickett, Jr., Prickett & Corpening on brief) for appellees.
 Before CHAPMAN, Circuit Judge, GEORGE ROSS ANDERSON, Jr., United States District Judge for the District of South Carolina, and EUGENE A. GORDON, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 CHAPMAN, Circuit Judge.
 Jetstream Aero Services, Inc. appeals an order of summary judgment issued against it on its 42 U.S.C. Sec. 1983/equal protection claim against defendants New Hanover County, various county employees, Air Wilmington, Inc., and Wilmington General Aviation Industries, Inc. Jetstream contends that the county wrongfully and intentionally used its regulatory and enforcement powers in a manner calculated to harm it, and that the private corporate defendants joined in a conspiracy with the county to ensure injury. We find that summary judgment was improperly granted as to the county defendants, but was properly granted as to the corporate defendants, so we reverse the order of the district court in part and affirm in part.
 * As the district court and both parties have recognized, this case arises in what Judge Oakes of the Second Circuit has labelled "a murky corner of equal protection law." LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir.1980). The subject is "murky" because there have been relatively few cases brought in the federal courts raising this precise aspect of equal protection law. Nonetheless, it is agreed that one may bring a Section 1983 action for a violation of equal protection when "unequal administration of a state statute" shows "intentional or purposeful discrimination." LeClair, 627 F.2d at 609-610; Moss v. Hornig, 314 F.2d 89, 92 (2d Cir.1963) (In a Section 1983 action for selective enforcement, in order to prove "that unequal administration of a state statute offends the equal protection clause one must show an intentional or purposeful discrimination"); Tarkowski v. Robert Bartlett Realty Co., 644 F.2d 1204, 1206 (7th Cir.1980) (same). The rule is largely grounded in Snowden v. Hughes, 321 U.S. 1, 8-9 (1944), where it was held that unlawful administration of a state statute, resulting in unequal application to those who are entitled to be treated alike, is a denial of equal protection if there is shown to be present an element of intentional or purposeful discrimination, and in McFarland v. American Sugar Co., 241 U.S. 79, 86-87 (1916), where Justice Holmes found that a state statute that bristled "with severities that touch the plaintiff alone" was arbitrary and a violation of equal protection.
 
 
 1
 The LeClair court, however, has provided the most complete discussion of the practical meaning of "intentional discrimination" in the equal protection setting. It stated that there is intentional discrimination by a state when: "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." LeClair, 627 F.2d at 609-610.
 
 
 2
 The potential liability of the corporate defendants is under a different theory and hinges upon whether there was a conspiracy between the private and public parties. That is, "the state official and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights." Moore v. Marketplace Restaurant, Inc., 754 F.2d 1336, 1352-1353 (7th Cir.1985). See also Adickes v. Kress Co., 398 U.S. 144, 152 (1970) ("a private party involved in such a conspiracy, even though not an official of the State, can be liable under Sec. 1983.").
 
 II.
 
 3
 The nature of appellate review of a grant of summary judgment is well established. As this court has recently stated, "we may affirm only if on the summary judgment record there was no genuine dispute as to any material fact, and if on the undisputed facts defendants were entitled to judgment as a matter of law." Stone v. University of Maryland Medical System, 855 F.2d 167, 175 (4th Cir.1988). While the burden is on plaintiff to present "specific facts," showing "that there is a genuine issue for trial," the "inferences to be drawn from [such] underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Finally, there "is no genuine issue for trial unless sufficient evidence favors the nonmoving party for a jury to return a verdict for that party." White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir.1987).
 
 
 4
 Neither the district court nor the parties disagree as to the relevant equal protection law as set forth in LeClair. Therefore, disposition of this appeal requires a review of the evidence and the inferences therefrom produced by Jetstream and whether it sufficiently indicates selective treatment with an intent to injure plaintiff by the county, and second, whether there is evidence of a conspiracy between the private defendants and the county.
 
 III.
 
 5
 Jetstream, a fixed base operator (FBO), has been in business at the Wilmington Airport since the early 1980s, and it provides basic support services for airplanes, including fuel, repair, parking, and storage. Jetstream has also spray-painted airplanes. The company's workspace is leased from the county, which owns the airport property. Jetstream's operation is subject to a wide variety of regulations and restrictions, including those in its lease, local rules particular to the local airport, adopted by the county commission, state building and safety codes, and Federal Aviation Administration rules. Most pertinent to this lawsuit are the enforcement of lease terms and of state and local rules which are largely the responsibility of county officials, including the county manager, county commissioners, and the airport manager. The record is unclear as to the precise beginning or source of this long-running dispute between Jetstream, the county, and its competitors, but it seems to have begun in early 1984, not long after Jetstream expressed a desire to expand from a limited to a full service FBO.
 
 
 6
 The corporate defendants, Air Wilmington and Wilmington General, are also FBOs at the Wilmington airport. They provide services similar to those offered by Jetstream. Perhaps the most significant fact about the two corporate defendants is that they are owned by members of the same family; and Jetstream contends that Wilmington General is just a paper entity, and that the corporations are run jointly and there has been a merger of the two corporations for all practical purposes. Wilmington General was created in 1985 when it purchased the assets of a previous FBO, Aeronautics, Inc.
 
 
 7
 Under LeClair Jetstream must present evidence of (1) selective treatment of the corporate defendants by the county and (2) evidence that there was an intent to harm or injure the plaintiff by the county. The evidence of intent to harm will be considered first, because the district court seemed to focus on it, and in most cases, it will be the most difficult hurdle for plaintiffs in this kind of case. Contrary to the holding of the district court, we find that Jetstream has introduced evidence sufficient to create an issue of material fact on the claim that the county acted with malicious or bad faith intent to harm.
 
 
 8
 Although it is unnecessary to recount each suggestion of wrongful intent, the most significant is an affidavit by Robert Harris, an employee of the Federal Aviation Administration from 1962 to 1987. Harris was assistant chief of the Atlanta Airports District Office, and his duties included investigating and assessing complaints involving FBOs and airports. Harris stated that following a March 1986 complaint of Jetstream that the county was discriminating against it by engaging in acts of harassment, including unfair enforcement of the lease between the county and Jetstream, he believed that "the actions taken by the County were pursued in a spirit of anger and hostility against Jetstream, and that I witnessed such emotions in my investigatory meetings with County officials." A second piece of evidence worth noting is in the deposition of Ed Samuels, the president of Jetstream. Samuels stated that, in January 1986, the county manager threatened to send inspectors to Jetstream for purposes of harassment as retaliation, if Jetstream appealed adverse county building code decisions. These are statements that go to the heart of this claimed violation. They are evidence that the county intended to enforce the law selectively against Jetstream and that this was done with a malicious or bad faith intent to harm.
 
 
 9
 The district court, although it conceded that this and other information was some evidence of hostility, seemed to conclude that such evidence was not enough for plaintiff to withstand the summary judgment motion because it was not observed prior in time to all of the acts which supposedly caused injury. There are two problems with the district court's reasoning. First, as a factual matter, it ignores Samuels testimony of antagonism before 1986. Second, and more seriously, LeClair does not require such evidence; it stated that if defendant went after plaintiff "to get him, for any reason, he should be liable." LeClair, 627 F.2d at 611. This suggests that the better rule is one that recognizes that a reasonable temporal conjunction between the evidence of animosity and the occurrence of wrongful acts is more appropriate to equal protection. To require a specific connection between each harmful act and specific evidence of intent, particularly in this context where evidence of intent is difficult to achieve, would tend to emasculate the right recognized in LeClair.
 
 
 10
 Although Jetstream has introduced sufficient evidence of hostility and discriminatory intent for the period of late 1985 and early 1986, it must also show that the county's malice had some concrete effect, that is, that it resulted in selective treatment resulting in harm to Jetstream. It is not enough, as plaintiff seems to imply, that some vague suspicion of adverse treatment of a general nature existed. Our inquiry on this point is directed to whether Jetstream was treated differently, because during these months all three FBOs were similarly situated, that is, they performed approximately the same functions on approximately the same scale.
 
 
 11
 First, Jetstream alleges that its spray painting operation was wrongfully shut down by the county. Plaintiff has presented evidence that from 1981 through October, 1985, it and its competitor, Air Wilmington, were engaged in spray painting. It is clear that Jetstream was ordered by the airport manager to stop painting in October, 1985, because of alleged building code violations. There is evidence that the county manager was interested in finding a way to shut down Jetstream; that the county building inspector did not know that spray painting was conducted at the airport until after the October order by the airport manager (which suggests that the code enforcement issue was created to harm Jetstream); that Jetstream derived a large part of its income from spray painting, while its competitors did not; that the FAA intervened to help Jetstream obtain an extension on its ability to spray paint; that the other FBOs continued to spray paint despite the ban; and that although Jetstream offered to remedy some of the code problems in its hangar the county delayed and ultimately rejected these good faith efforts based on unreasonable interpretations of the building code. Many of these events took place after the specific evidence of intent to harm was observed in early 1986, and all of the events took place within a few months of these specific acts of alleged hostility.
 
 
 12
 Second, Jetstream complains that the county attempted to thwart and to delay its efforts to become a full service FBO. More specifically, Jetstream alleges that the county refused to allow it to lease hangar space necessary for full FBO status. Jetstream has also introduced evidence that the county would not allow it to use an above-ground fuel tank it purchased, because the tank allegedly did not meet safety standards, although the same tank had been used above ground at the airport since before 1970, prior to its purchase by Jetstream, and the tank had earlier been certified for use underground, a use which requires higher standards. The tank episode is significant, because Jetstream's complaints about this ruling allegedly prompted the county manager's threat to harass Jetstream with inspectors in January, 1986. Jetstream also introduced evidence that the county inspector unreasonably denied Jetstream a permit for the placing of a temporary trailer on its leasehold, although the airport manager and the FAA had approved. This occurred after the alleged threats by the county manager in January, 1986.
 
 
 13
 Third, there are material disputes as to the enforcement of the lease between the county and Jetstream. Jetstream introduced evidence that it was pressured to rent more acreage at the airport than it intended, that the FAA intervened to resolve the problems, and that Jetstream pays more proportionately than do the other FBOs for leased space and property. The district court erroneously held that Hill Aircraft and Leasing Corp. v. Fulton County, Georgia, 561 F.Supp. 667, 678 (N.D.Ga.1982), supports its conclusion that these kinds of contractual questions do not rise to a constitutional level. Hill was principally concerned with accusations that an FBO had been favorably treated in the granting of a lease on property which the plaintiff also sought, and to which the plaintiff had no right. Jetstream's complaint is with the terms and enforcement of its existing lease. If this case involved only a dispute over the terms of a lease, the constitutional issue might not be properly raised, but here questions about the enforcement of the lease are clearly relevant to discerning whether there has been selective enforcement of local and state law.
 
 
 14
 Finally, the district court maintained that even if Jetstream had shown that it was similarly situated to the other FBOs, but disparately treated, the action of the county must bear only a rational relationship to a legitimate interest. This begs the factual question of this lawsuit, because use of public authority to harass a business without cause is not a legitimate state interest.
 
 
 15
 The evidence submitted on disparate treatment, in combination with the evidence of hostility and malice, are enough for plaintiff to survive the county's motion for summary judgment. There are just too many unresolved questions about the way in which the county interpreted its own ordinances, the state building code, and the lease between itself and Jetstream for summary judgment to be appropriate. For this reason, the judgment of the district court, as applied to the county defendants (New Hanover County, Rudolph C. Shackelford, Jr., John E. Nolan, G. Felix Cooper and Sky D. Conklin), must be reversed.
 
 IV.
 
 16
 Turning to the question of whether there is sufficient evidence of a conspiracy among the corporate defendants and the county defendants, we conclude that the evidence of such a conspiracy is lacking. Jetstream argues that evidence of a conspiracy exists because one of the principals of the private corporations pressured the airport manager to harass Jetstream, that Air Wilmington reported various alleged regulatory violations by Jetstream to the county, that the corporate defendants benefitted from non-enforcement of county and state regulations, and that the county agreed to the buyout of Aeronautics, Inc. by Wilmington General and gave the new business favorable lease terms pursuant to secret consultations with county and airport officials. Although these contentions may suggest a friendly relationship between the county and the private defendants, and indicate that the private defendants may have received disparate treatment from the county's actions, they do not present satisfactory evidence of a joint plan of action or an agreement between the county and the corporations to injure plaintiff. An agreement is the heart of a conspiracy and the evidence of such an agreement is lacking. Plaintiff's evidence does not rise above a mere speculation. See Tarkowski, 644 F.2d at 1206-1207. The district court was correct in granting summary judgment in favor of Air Wilmington and Wilmington General.
 
 V.
 
 17
 Jetstream has also asked this court to review the district court's denial of its motion to reconsider, alter or amend the granting of summary judgment. In this motion plaintiff asked the court to consider the contents of an affidavit given by an airport employee after the granting of summary judgment. This affidavit indicated that the airport manager routinely requested harassing inspections and that his hostility toward Jetstream was evident months before the October, 1985 conflict over spray-painting by Jetstream. The district court denied this motion on the ground that plaintiff had not exercised due diligence in discovering the information. We find it unnecessary to resolve the question because there is sufficient evidence to require a reversal of the summary judgment without this additional information. The affidavit adds nothing to the purported conspiracy between the county and the private defendants.
 
 
 18
 For the above reasons, the judgment of the district court is reversed as to the county defendants and affirmed as to defendants Wilmington General and Air Wilmington.
 
 
 19
 REVERSED IN PART AFFIRMED IN PART, AND REMANDED.