Eugenio **BIZZARRO** and **Gary Klivans**, Plaintiff–Appellees,

v.

Joseph **MIRANDA**, individually, Defendant,

**Rocco A. Pozzi**, individually, **Anthony Czarnecki**, individually, **Kevin Cheverko**, individually, and **The County of Westchester**, **New York**, Defendant–Appellants.

Docket No. 03–9047.

United States Court of Appeals, Second Circuit.

Argued: May 14, 2004.

Decided: Jan. 7, 2005.

Joseph A. Saccomano, Jr., Jackson Lewis LLP, White Plains, NY, for Defendant–Appellants.

Drita Nicaj, Lovett & Gould (Kim Berg, on the brief), White Plains, NY, for Plaintiff–Appellees.

Before: LEVAL and KATZMANN, Circuit Judges, and MURTHA, District Judge.*

LEVAL, Circuit Judge.

Plaintiffs Eugenio Bizzarro and Gary Klivans, employees of the Westchester County Department of Corrections (DOC), brought this suit against the County and several DOC officials alleging that the defendants violated their Fourteenth Amendment rights by instituting disciplinary charges against the plaintiffs and removing Bizzarro from a privileged work assignment after the plaintiffs refused to assist the DOC in an internal investigation. The individual defendants asserted a qualified immunity defense and moved for summary judgment. The United States District Court for the Southern District of New York (Charles L. Brieant, Jr., *J.*) denied the motion on the ground that a jury could find that defendants violated plaintiffs' clearly established equal protection and due process rights. On interlocutory appeal, we reverse in part the denial of summary judgment. With respect to the claim of denial of equal protection, taking the version of the facts most favorable to plaintiffs, plaintiffs cannot establish a violation.

## Background

Resolving all disputes and drawing all reasonable inferences in favor of plaintiffs, we decide this appeal on the following facts. Throughout the relevant events, plaintiffs Bizzarro and Klivans worked as superior officers in the Department of Corrections, Klivans as a captain and Bizzarro as a sergeant. Both were members of the Superior Officers Association union.

1. *The investigation.* During December 2001, Kevin Cheverko, the commander of the DOC's Special Investigations Unit (SIU), was conducting an investigation of a corrections officer suspected of smuggling contraband to inmates at DOC facilities. On December 12, 2001, Cheverko requested that Klivans assist him in the investigation by retrieving a bottle of alcohol from an inmate who was acting as an informant in the investigation. Klivans obliged. A week later, on December 19, Cheverko asked Klivans to deliver money and a recording device to the same inmate. Klivans told Cheverko he no longer wanted to assist in the investigation. Cheverko become "a little angry," "a little heated," and "miffed." He told Klivans, "We need you to do this," but did not order Klivans to assist. Cheverko then turned to Bizzarro. Bizzarro also refused to assist in the investigation, in part because he did not want to bring contraband into the facility. Cheverko informed DOC Commissioner Rocco Pozzi that Klivans and Bizzarro had refused to assist in the investigation. Pozzi told Cheverko that, as commander of the SIU, Cheverko had the authority to order the officers to assist, and that in any case he could say the order came directly from the commissioner.

On the morning of December 27th, at a meeting in the parking lot of a diner, Cheverko told Bizzarro that he was ordering him to assist in the investigation and

---

* The Honorable J. Garvan Murtha, United States District Judge for the District of Vermont, sitting by designation.

that the order came directly from the commissioner. Bizzarro again refused, saying that assisting would place strains on his family, that he was upset at the outcome of an earlier episode in which he had helped Cheverko, and that SIU had a bad reputation. Bizzarro said he would not assist without a personal order from the commissioner. Cheverko became "enraged, engulfed with anger, screaming at [Bizzarro] …, 'If you're not going to participate, then I'm going to give you an order to participate. And before this whole thing is over, every supervisor will see it's their obligation to cooperate, participate in the investigation. And if you're not going to do it, I'm going to give you an order to do it right now.'" Bizzarro replied that "the conversation was over."

Later that day, Cheverko and Bizzarro met again in Cheverko's office. Cheverko reiterated the request to assist, but offered Bizzarro an opportunity to think about it. Cheverko also told Bizzarro that, if Bizzarro kept the investigation confidential, Cheverko would not report the insubordination to his superiors. Cheverko subsequently changed his mind, however, and notified Bizzarro that he would be charged with disciplinary violations if he did not cooperate.

2. *The disciplinary process.* On January 7, 2002, Cheverko delivered a written report to Anthony Czarnecki, special assistant to Commissioner Pozzi, detailing Klivans's and Bizzarro's refusal to assist in the investigation. According to Cheverko's report, there was a perception among superior officers that they were not required to assist the SIU in internal investigations. The report noted that "[t]his appears to be a long-standing systematic problem that has not been addressed in the past," and that "SIU investigators have informed me that prior investigations have been lost for this very reason."

Cheverko indicated that he personally believed that the policy requiring officers to assist was clear, but that it might be a good idea to make the policy more explicit "to really jam it down people's throats" and "offset the perception that people have that the policy is unclear." The report thus recommended that Bizzarro be formally charged with "insubordination, disobedience of orders, and conduct unbecoming an officer." After receiving Cheverko's report, Czarnecki prepared his own report, dated January 24, 2002, which he delivered along with Cheverko's report to Commissioner Pozzi. Czarnecki's report echoed Cheverko's recommendation that Bizzarro be formally disciplined, and recommended that Klivans be counseled.

Commissioner Pozzi had final discretionary authority over all disciplinary matters. His usual practice was to make decisions based on the reports prepared by his subordinates. Cheverko and Czarnecki both lacked authority to institute disciplinary charges. If Pozzi decided that formal discipline appeared warranted, his practice was to ask the County Law Department to investigate the matter and draft appropriate charges.

Pozzi agreed with Czarnecki's recommendations and forwarded the report to the Law Department to draft charges. After consulting with Cheverko and Czarnecki, the county attorneys advised that Bizzarro could be charged with violating § 13.1 of the DOC Code of Conduct, which provides:

> A peace officer employee shall cooperate in any internal or official investigation by the Department, truthfully answer all questions, and submit any required written report in connection with such investigations consistent with the "Correction Officer Bill of Rights."

The attorneys also suggested that if Bizzarro was to be charged under § 13.1,

Klivans ought to be charged as well, because he had similarly refused to assist in the investigation. In contrast, the attorneys recommended that charges against Bizzarro for insubordination might be difficult to sustain because Bizzarro might reasonably have believed that Cheverko had released him from the direct order to assist so long as Bizzarro maintained the confidentiality of the investigation. On the basis of this advice, Commissioner Pozzi decided to bring § 13.1 charges against both Bizzarro and Klivans, but not to bring insubordination charges. The charges were instituted on March 13, 2002. Pozzi also removed Bizzarro from the DOC's Emergency Response Team.

After the disciplinary charges were brought, the president of the Superior Officers Association, Captain Robert Buckley, interceded with Commissioner Pozzi on behalf of Klivans and Bizzarro. Pozzi was initially reluctant to withdraw the charges, but eventually offered to do so "as a favor to [Buckley]," on the condition that Bizzarro and Klivans sign releases promising not to sue. Neither would agree to that condition. Nonetheless, on May 8, 2002, Pozzi eventually decided to withdraw the charges unilaterally.

3. *This lawsuit.* Bizzarro and Klivans then filed this suit against Pozzi, Czarnecki, Cheverko, and Westchester County under 42 U.S.C. § 1983, alleging violation of their Fourteenth Amendment rights.[1] The individual defendants moved for summary judgment, raising a defense of qualified immunity. The district court denied the motion, stating that it was "impracticable to attempt to resolve this fact intensive issue on a summary judgment motion." The court ruled:

[C]ertainly the plain meaning of the disciplinary rule ... would suggest that no reasonable commander could believe the rule permits issuing an order for undercover activity by a corrections officer .... In this Court's view there was no legitimate basis for the order, if such it was, issued to the Plaintiffs, and for refusal of which they were subjected to disciplinary charges .... Clearly, there is a Fourteenth Amendment violation in this case on Plaintiffs' view of the disputed facts; both of due process in charging the Plaintiffs with conduct which a reasonable person would have known was not violative of the rule upon which the charges were based, and there is also a disputed issue of fact as to whether the rule was applied selectively .... If the evidence at trial shows that the plaintiffs were selectively treated they may recover damages for an Equal Protection violation.

This appeal followed.

### Discussion

The individual defendants argue on appeal that the district court should have granted their summary judgment motion on the basis of qualified immunity because the evidence taken in the light most favorable to plaintiffs cannot establish any violation of plaintiffs' constitutional rights. We conclude that plaintiffs cannot make out an equal protection claim on these facts, and that the district court should have granted the individual defendants summary judgment on that claim. Because the defendants have made no arguments relating to due process, we do not address that issue.

1. *Qualified Immunity and Appellate Jurisdiction.*

■ Public officials are entitled to immunity from civil liability "if their actions

---

1. The complaint also named DOC Chief of Operations Joseph Miranda, but plaintiffs have voluntarily dismissed all claims against him.

were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard*, 282 F.3d 123, 132 (2d Cir.2002) (citation omitted). We have jurisdiction to review the denial of a motion for summary judgment on the basis of qualified immunity if the defendant is entitled to immunity as a matter of law on the plaintiff's version of the facts. *Id.* at 131–32 ("[A] district court's mere assertion that disputed factual issues exist[ ] is not independently sufficient to preclude an immediate appeal.") (quoting *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996)) (internal quotation marks and alteration omitted). Therefore, if plaintiffs' version of the facts reveals that the officials could reasonably have believed they were not violating plaintiffs' constitutional rights, the district court should have granted the motion for summary judgment and we will reverse the court's denial of that motion. *A fortiori*, if that version of the facts reveals that defendants did not violate plaintiffs' constitutional rights at all, the defendants are entitled to have the case dismissed.

### 2. *The Equal Protection Claim.*

Plaintiffs claim that by initiating the disciplinary proceedings against them and removing Bizzarro from the Emergency Response Team, defendants violated their clearly established constitutional right to equal protection of the laws. Plaintiffs present their claim on two slightly different theories. First, adopting the theory of *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir.1980), plaintiffs argue that defendants intentionally treated them differently from other similarly situated corrections officers because of a malicious intent to injure them. Second, failing proof of a malicious motivation, plaintiffs argue under the theory of *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) that

defendants intentionally treated them differently from others with no rational basis for the difference in treatment. We treat these claims in sequence.

a. LeClair *Claim Based on Alleged Personal Animus.* We have held that the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or malicious or bad faith intent to injure a person.*" *LeClair*, 627 F.2d at 609–10 (emphasis added). At the same time, we have noted that cases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply." *Id.* at 608. In *LeClair*, the case in which we first explored that murky corner, the plaintiff, a dairy farmer, alleged that the defendant milk inspector had maliciously denied him a license to ship milk out of state. We scoured the record for evidence of malicious or bad faith intent to injure the plaintiff, but found none beyond the fact that the farm inspector "was in a spiteful mood." *Id.* at 610–11. We therefore held that there was no constitutional violation.

We have frequently referred to the *LeClair* formulation in our circuit, often in the zoning context, but rarely have found a constitutional violation. *See, e.g., Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir.2004) (finding insufficient evidence of malice to support *LeClair* claim in employment context); *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir.2001) (same); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273

F.3d 494, 499–500, 502–3 (2d Cir.2001) (finding insufficient evidence of malice in zoning context); *Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996) (same); *Zahra v. Town of Southold,* 48 F.3d 674, 684 (2d Cir.1995) (same); *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10–11 (2d Cir.1992) (finding insufficient evidence of malice to support claim against state agency, which refused to re-enroll plaintiff as Medicaid provider). *But see Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1353 (2d Cir.1994) (finding an issue of material fact as to whether defendants "singled out" plaintiff company "with a malicious or bad faith intent to injure" it).

█ Searching the record here, we find once again that, drawing all inferences and resolving all disputes in favor of plaintiffs where reasonable, plaintiffs cannot establish that defendants acted out of any personal dislike of them. In substantiating their claim that the disciplinary charges were motivated by malice, plaintiffs rely first on evidence that Cheverko became angry at plaintiffs at various points during the contraband investigation. For example, during the discussion in which Klivans declined to assist, Cheverko became "a little angry," "a little heated," and "miffed." During his discussion with Bizzarro in the diner parking lot, Cheverko became "enraged, engulfed with anger, screaming at [Bizzarro] ..., 'If you're not going to participate, then I'm going to give you an order to participate. And before this whole thing is over, every supervisor will see it's their obligation to cooperate, participate in the investigation.'" Later, describing his report, Cheverko recommended that the policy requiring officers to assist in investigations be made more clear, to "really jam it down people's throats."

In relying on evidence of the defendants' angry responses to the plaintiffs' recalci-trance, however, plaintiffs tend to undercut rather than to bolster their theory. The branch of equal protection law that protects individuals from unequal treatment motivated by "malicious or bad faith intent to injure" provides protection from adverse governmental action that is not motivated by "legitimate governmental objectives." *Esmail v. Macrane,* 53 F.3d 176, 180 (7th Cir.1995) (Posner, *J.*). If the motivation to punish is to secure compliance with agency objectives, then by definition the motivation is not spite, or malice, or a desire to " 'get' [someone] for reasons wholly unrelated to any legitimate state objective." *Id.* at 180.

The plaintiffs' evidence demonstrates that Cheverko grew angry at their refusal to assist in the investigation because he wanted the investigation to succeed. Such a motivation is not impermissible in the sense required by *LeClair. Cf. Harlen Assocs.,* 273 F.3d at 503 ("To the extent that the record reveals any hostility," it was motivated by the proposed use of the property deemed inimical to governmental objectives, and "therefore does not implicate the Equal Protection Clause.").

Plaintiffs also argue that the disciplinary charges themselves supply the requisite evidence of malice. We disagree. The *LeClair* type of equal protection claim requires proof of disparate treatment and impermissible motivation. To prevail, plaintiffs must prove that the disparate treatment was *caused by* the impermissible motivation. They cannot merely rest on a showing of disparate treatment. *See, e.g., Crowley,* 76 F.3d at 53 ("[A] demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith."); *Zahra,* 48 F.3d at 684 ("The evidence suggesting that Zahra was 'treated differently' from others does not, in itself, show malice."); *LeClair,* 627 F.2d at 610–11

(" '[D]ifferent treatment' ... do[es] not it [it]sel[f] show malice.").

b. Olech *Claim Based on Allegedly Intentionally Irrational Treatment.* Plaintiffs also allege that defendants singled them out for discipline without any rational basis at all, a theory which has its roots in the Supreme Court's recent decision in *Olech.* Plaintiff in *Olech* alleged that the defendant village had, either based on animus or completely arbitrarily, required that she give a 33–foot easement before agreeing to connect her to the village water supply, but required only a 15–foot easement from similarly situated property owners. The Supreme Court held that the allegation that the plaintiff had been "intentionally treated differently from others similarly situated" with "no rational basis for the difference in treatment" was enough to state a constitutional claim. *Olech,* 528 U.S. at 564, 120 S.Ct. 1073. Justice Breyer, concurring, noted that the plaintiff had also alleged personal ill will on a theory similar to that of *LeClair. Id.* at 566, 120 S.Ct. 1073.

We have not resolved whether, in light of *Olech,* the theory espoused by *LeClair* remains the proper one in "class of one" claims. *See, e.g., DeMuria v. Hawkes,* 328 F.3d 704, 707 n. 2 (2d Cir.2003); *Giordano,* 274 F.3d at 751; *Harlen Assocs.,* 273 F.3d at 500. However, we have restated or applied the *LeClair* theory in several cases, although in some of the cases our discussion was merely dicta. *See Cobb,* 363 F.3d at 109–110 (citing *Olech* and remanding for retrial a claim that defendants had intentionally treated plaintiffs differently without a rational basis); *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 363–64 (2d Cir.2002) (citing *Olech* but determining that plaintiff's claim was premised on an impermissible motive rather than on irrationality); *Jackson v. Burke,* 256 F.3d 93, 96–97 (2d Cir.2001)

(citing *Olech* but finding no evidence of intentionally disparate treatment); *Gelb v. Bd. of Elections,* 224 F.3d 149, 157 (2d Cir.2000) (citing *Olech* but certifying unrelated questions of law to the New York State Court of Appeals).

Regardless of whether malice is required, however, the evidence adduced on the summary judgment motion is more than sufficient to foreclose a claim based on *Olech.* It is clear and uncontradicted that the initiation of disciplinary charges against these plaintiffs was not arbitrary, or without basis in departmental policy. It was done to punish plaintiffs for refusing to assist in the investigation and to deter other officers from similarly refusing to assist in investigations. Because the defendants' conduct was rationally related to accomplishing the work of the DOC (which plaintiffs do not dispute), defendants' actions were not without rational basis.

Plaintiffs contend that it was irrational for defendants to file disciplinary charges against them under § 13.1 of the Code of Conduct because they did not in fact violate that section. They argue that the text of § 13.1 as a whole, which requires officers to answer questions truthfully and mandates consistency with the Correction Officer's Bill of Rights, compels cooperation only when the officer himself is a subject of the investigation or has witnessed misconduct. They contend further that this limited mandate was the prevailing understanding of the Code at the time, and that it was known to the individual defendants.

This argument misses the mark. The pertinent question in a constitutional claim is not whether the defendants correctly understood the rules they were enforcing. *Olech* does not empower federal courts to review government actions for correctness. Rather, an *Olech*-type equal protection claim focuses on whether the official's con-

duct was rationally related to the accomplishment of the work of their agency. If a jury could reasonably find that there was no rational basis for the defendants to believe that initiating charges against these plaintiffs could serve the legitimate goals of the DOC, a claim would lie.

Because encouraging cooperation with internal investigations is a legitimate interest of the DOC, because defendants sought charges under a section of the Code of Conduct that could on its face be construed to require cooperation of the type being sought, and because before initiating any charges defendants consulted extensively with the County Law Department, a jury could not reasonably find that defendants acted with the requisite irrationality.[2]

Plaintiffs other arguments are similarly unavailing. They contend their case is strengthened by the fact that the charges against them were ultimately withdrawn, that the DOC eventually amended the rules to state clearly an affirmative obligation of an officer in the plaintiffs' class to assist in such investigations, and that the DOC initially asked plaintiffs to agree not to sue as a condition for withdrawing the disciplinary charges. These facts add very little to plaintiffs' case and fail to show that defendants' actions were not rationally related to furthering a legitimate objective of the DOC.

3. *Conclusion.* Because plaintiffs cannot make out a substantive equal protection violation on their version of the facts, the individual defendants were entitled to summary judgment.[3]

---

2. Defendants rely upon language from our decision in *Cobb* to support a different standard, but we do not think *Cobb* requires a different result. Plaintiffs in *Cobb* were Westchester DOC officers who brought *LeClair* and *Olech* equal protection claims against Commissioner Pozzi and the County for pursuing ultimately unsuccessful disciplinary charges against them. Plaintiffs won a jury verdict and defendants filed a post-trial motion for judgment as a matter of law. We granted the motion and dismissed plaintiffs' *LeClair* claim because the trial evidence did not provide any basis for concluding that the defendants had sought the disciplinary charges because they didn't like plaintiffs—rather, the evidence "strongly suggested that the defendants acted because they believed that the plaintiffs were engaged in an unlawful job action." *Cobb*, 363 F.3d at 108–9. We also vacated the verdict on the *Olech* claim (because of faulty jury instructions), but we remanded for retrial on that claim. We stated that, even if the defendants subjectively believed that the disciplinary charges were justified, on the facts adduced "[a] jury could find that the defendants' subjective belief was unwarranted and that such an unwarranted belief resulted in the irrational treatment of the plaintiffs." *Id.* at 110.

We recognize that the term "unwarranted" is ambiguous and arguably supports the proposition that a plaintiff can prevail on an *Olech*

claim even where the defendant subjectively intended to pursue legitimate goals, but did so incorrectly or unreasonably. But we do not think that is what the *Cobb* court intended. The language quoted from *Cobb* was not meant to work any change in the underlying equal protection law. Indeed, immediately before that language, the *Cobb* court cited *Olech* in support of the proposition that an equal protection claim would lie if plaintiffs could prove that "that they were treated differently from similarly situated officers ... and that there was 'no *rational* basis for the difference in treatment.'" *Id.* (quoting *Olech*, 528 U.S. at 564, 120 S.Ct. 1073) (emphasis added).

In *Cobb*, defendants sought to discourage illegal job actions. We remanded for trial because it was possible, based on the facts adduced there, that there was no rational basis to believe that the disciplined officers had in fact engaged in any job action. Here, by contrast, there is no dispute that plaintiffs engaged in the acts that defendants, as a matter of policy, wished to discourage. The only dispute is whether initiating discipline under the Code was a rational means of effectuating that policy.

3. As our review of the record reveals not only that the individual defendants are entitled to qualified immunity on the equal protection

## Conclusion

The judgment of the district court is REVERSED in part and REMANDED in part for further proceedings consistent with this opinion.

claim, but that plaintiffs cannot make out an equal protection violation at all, it appears the district court should dismiss the equal protection claim against Westchester County as well.