Norman E. ROTH, University Hill Realty, Ltd., Stampede, LLC., Stampede II, LLC., Stampede III, LLC., Plaintiffs,

v.

CITY OF SYRACUSE, Syracuse Housing Authority, Frederick R. Murphy, Individually and in his professional capacity as Director of Syracuse Housing Authority, Roy Bernardi, Individually and in his professional capacity as Mayor, Vito Sciscioli, Individually and in his professional capacity as Director of Community Development, and Terry Kresser, Individually and in his professional capacity as Supervisor of Syracuse Housing Authority's Section 8 Program, Defendants.

No. 99–CV–572.

United States District Court, N.D. New York.

May 5, 2000.

Mark David Blum & Associates, Fayetteville, NY, for Plaintiffs.

Bond Schoeneck & King, LLP, Syracuse, NY (Robert Kirchner, of counsel), for Defendants Syracuse Housing, Authority, Frederick R. Murphy and Terry Kresser.

Frederick R. Guy, Corporation Counsel, Syracuse, NY (Karen M. Richards, Assistant Corp. Counsel, of counsel), for Defendants City of Syracuse, Roy Bernardi and Vito Sciscioli.

### MEMORANDUM–DECISION AND ORDER INTRODUCTION

MORDUE, District Judge.

Plaintiff Norman E. Roth is in the business of property rental and management. He owns and manages several rental properties in the neighborhoods in and around the University area in the City of Syracuse. The other named plaintiffs are all businesses owned and operated by Roth.

Defendant Syracuse Housing Authority ("SHA") is a public corporation and a public housing agency responsible for administering state and federal low-income housing programs within the City of Syracuse. SHA is a separate legal entity from the City of Syracuse. SHA employees are not employees of the City of Syracuse and vice versa. Defendant Frederick R. Murphy is employed by SHA as its Executive Director. Defendant Terry Kresser supervises SHA's administration of low-income housing programs in the City of Syracuse.

Defendant Roy Bernardi is the Mayor of the City of Syracuse, which municipal entity has no involvement in any affairs of SHA. Defendant Vito Sciscioli is Director of Development for the City of Syracuse and reports directly to the Mayor. In his capacity as an employee of the City of

Syracuse, he has no involvement in the management, control or direction of SHA's administration of low-income housing programs. Sciscioli is a member of SHA's Board of Directors.

The present complaint comprises 114 paragraphs and alleges that defendants violated a number of plaintiffs' federal and constitutional rights. Defendants move for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment on a variety of legal and factual grounds.[1]

## FACTUAL BACKGROUND

Plaintiffs rented properties to students at Syracuse University and LeMoyne College for many years until 1992 when Syracuse University amended its student housing policy to require sophomore, as well as freshman students, to live on campus. This change left many owner/landlords, such as plaintiffs, with vacant properties. Plaintiffs then became involved in the federally subsidized, low-income housing program known as "Section 8," which is administered in the City of Syracuse by SHA and funded by the United States Department of Housing and Urban Development ("HUD").

Under the Section 8 program, a low-income individual or family requiring rent assistance applies to a public housing agency such as SHA for approval to receive benefits based on family composition, income and citizenship status. The approved individual or family then locates a rental property and landlord who will accept Section 8 payments. Once such a property and landlord are identified, the tenant signs a lease and the public housing agency and landlord enter into a standard Housing Assistance Payment ("HAP") contract. Under this arrangement, the public housing agency pays the majority of the rent and the tenant and/or local social services agency is responsible for the balance.

In the fall of 1996, various neighborhood associations began complaining to local and federal elected officials that Roth and other Section 8 owners/landlords were renting properties to tenants with propensities toward excessive noise, debris, destruction of property and criminal activity, with deleterious effects on the neighborhoods. Residents further complained that building code violations were consistently ignored. One such property, 315–317 Greenwood Place in the City of Syracuse, was owned by Roth. In October 1996, SHA advised Roth in writing that it had received a request from a United States Senator's office to remedy complaints regarding the offensive lifestyle of tenants of said property, which was contributing to a decline in the quality and desirability of the surrounding neighborhood. SHA's letter to Roth indicated that its hands were tied with respect to terminating Section 8 benefits paid to such "undesirable" tenants and that it was up to Roth and other landlords to preserve the integrity of the subsidized housing program by adhering to their "contractual" responsibilities. It appears from memoranda and documentation submitted by plaintiffs herein that SHA's main concern in this regard was that Roth and other Section 8 landlords screen prospective tenants by directing inquiries to

1. Rule 12(b) of the Federal Rules of Civil Procedure provides in pertinent part that "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." All defendants moved herein for dismissal and/or summary judgment and filed with the Court affidavits and other evidentiary material in support of their motions. Plaintiffs responded in kind to defendants' papers, filing affidavits and evidentiary materials of their own. Satisfied that all parties were and are on notice that matters outside the complaint are being considered herein, the Court thus treats and disposes of the present motions in accordance with Rule 56 of the Federal Rules of Civil Procedure.

their former landlords so as to avoid renting to disruptive people. The City and Mayor's office pressured SHA to ensure that its subsidized properties were inspected for building code violations and encouraged the agency to be more responsive to citizen complaints regarding Section 8 tenants and landlords who were viewed as public nuisances.

In September 1997, SHA notified Roth that he and his companies were suspended from participation in the Section 8 housing program pending its investigation of his "property management practices." SHA indicated that during its investigation, present contracts would be honored, but no new HAP contracts would be executed. Roth's attorney immediately requested a meeting with SHA to discuss the suspension. The meeting was scheduled to take place on November 6, 1997. On October 30, 1997, however, HUD advised SHA in writing that Roth's suspension did not conform to federal regulations and the HAP contract[2] and ordered SHA to reinstate Roth to full and unrestricted participation in the Section 8 program. Based on the order of reinstatement, Roth's attorney canceled the November 6, 1997, meeting with SHA.

On November 12, 1997, Roth filed a complaint with HUD alleging that SHA had violated the Fair Housing Act (42 U.S.C. § 3601 *et seq.*) by suspending him from participation in the Section 8 program because he was renting to African–American tenants in primarily all-white neighborhoods. Roth alleged that SHA was thereby denying minority tenants fair housing by interfering with their use of Section 8 federal subsidies. In January 1999, after investigating these charges, HUD issued a "Determination of No Reasonable Cause" to believe that SHA en-gaged in any discriminatory housing practices.

Notwithstanding its compliance with HUD's October 1997 order of reinstatement, SHA advised Roth's attorneys on November 17, 1997, that its investigation of Roth was continuing. In January 1999, as part of its investigation, SHA invited Roth to attend a meeting with Director Murphy to discuss the issue of whether and how he screened his tenants. Roth, through his attorney, chose not to meet with SHA on the grounds that failure to screen was not a valid basis on which to disapprove of Roth as a Section 8 landlord and that HUD had exclusive jurisdiction over any decisions regarding Roth's participation in the Section 8 program.

On February 5, 1998, SHA advised Roth in writing that, after concluding its investigation into whether he screened prospective tenants as required by existing HAP contracts, SHA would not approve any future Section 8 leases submitted by Roth or any of his businesses, although it would not terminate any existing HAP contracts. SHA explained that its decision was based on evidence it gathered which established not only that Roth had not screened tenants as required by his contracts, but that he had falsely represented to SHA that he had done so, with the purpose of influencing the outcome of SHA's investigation. SHA advised that it was exercising its discretion under HUD regulations to deny approval to tenants wishing to lease units from Roth or any of his companies.

Roth filed a petition challenging SHA's determination pursuant to N.Y.C.P.L.R. Article 78. On October 27, 1998, the Honorable Parker J. Stone, New York State Supreme Court, holding that owners were not required to screen prospective tenants in order to participate in the Section 8 program,[3] granted Roth's petition in part

---

**2.** To wit, HUD advised SHA that undesirable "management practices" was not a valid ground upon which to disapprove an owner/landlord under 24 CFR 982.306. Moreover, the HAP contract required that SHA advise an owner/landlord in writing of the reasons for its determination in the event it decided a breach of contract occurred.

**3.** The Low Income Housing Act provides that the selection of tenants for subsidized housing units shall be the function of the owner. *See*

by vacating SHA's determination not to approve any future Section 8 leases submitted by Roth or his companies.

In March 1999, HUD responded to a complaint made by Roth regarding SHA's February 1998 determination to deny approval of any future HAP contracts, stating that SHA complied fully with its October 1997 directive to restore Roth to the housing program. HUD noted that this directive applied only to the October 1997 suspension and not to future matters involving Roth and SHA. Nor was the directive intended to require SHA to seek HUD approval before taking future action against Roth. HUD noted that public housing agencies such as SHA had "clear authority to disapprove an owner and refuse to do business with him/her." Moreover, HUD stated that it had no jurisdiction to interfere in the matter in any event because SHA had appealed Judge Stone's decision and the case was in the "hands of the judicial system."

The New York State Appellate Division, Fourth Department, affirmed Judge Stone's determination, stating: "The authority granted to owners to screen tenants was permissive, not mandatory (see, 24 CFR 982.307 [former (a)(2) ] ). Because respondent could not suspend petitioners for failing to screen tenants, any misrepresentation by petitioners that they had screened prospective tenants was not a misrepresentation of a material fact . . . .". *Roth v. Syracuse Housing Authority,* 706 N.Y.S.2d 555 (N.Y.A.D. 4 Dept.).

Plaintiffs then filed the present action in April 1999. The complaint comprises six causes of action including a claim under 42 U.S.C. § 1983 that defendants violated plaintiffs' rights under the Fourth and Fourteenth Amendments as well as the Due Process, Equal Protection, Takings and Privileges and Immunities Clauses of the Constitution. Plaintiffs also allege that defendants violated the Fair Housing Act, engaged in discriminatory enforcement of the laws and/or abuse of process in violation of 42 U.S.C. § 1983 and are liable under New York law for tortious interference with plaintiffs' business relations, *prima facie* tort and defamation.[4] Plaintiffs seek recovery of ten million dollars on each cause of action.

### DISCUSSION

#### A. *Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Substantive law determines which facts are material, that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to any issue on which the moving party does not bear the burden

42 U.S.C. § 1437f(d)(1)(A). While HUD regulations state that owners are "permitted and encouraged" to screen families for tenancy suitability, there is no requirement that owners do so. *See* 24 CFR 982.307(a)(2). In fact, the regulation entitled "Owner responsibilities" states only that owners are obligated to 1) perform all "management and rental functions" including selecting tenants and "deciding" if prospective tenants are "suitable;" 2) maintain rental units in accordance with HUD standards; 3) comply with equal opportunity requirements; 4) provide information to public housing agencies required under

HAP contracts; 5) collect rent and security deposits from tenants along with charges for damage to the rental property; 6) enforce tenant obligations under any lease; and 7) pay for utilities and services if otherwise not the responsibility of the tenant. These regulations clearly do not suggest that screening of prospective Section 8 tenants is anything other than an optional and discretionary function of property owners.

4. The claim of defamation is lodged only against defendant Frederick R. Murphy.

of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the non-moving party's case. *See id.* at 325, 106 S.Ct. 2548. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *See Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Indeed, the nonmoving party's opposition may not rest on mere denials of the moving party's pleading, but "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The standard for granting summary judgment mirrors the directed verdict standard under Fed.R.Civ.P. 50(a) which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "It is a gratuitous cruelty to parties and their witnesses to put them through the ordeal of a trial when the outcome is foreordained." *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983). It is with these considerations in mind that the Court addresses defendants' motions for summary judgment.

### B. *Plaintiffs' Claims Under 42 U.S.C. § 1983*

#### 1. Deprivation of a Property Interest

Plaintiffs' first and third causes of action are premised on violations of federal and constitutional rights actionable under 42 U.S.C. § 1983. To state a claim upon which relief may be granted under section 1983, a plaintiff must allege 1) that the challenged conduct was attributable to a person acting under color of state law; and 2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See Eagleston v. Guido,* 41 F.3d 865 (2d Cir.1994).

Review of plaintiffs' first cause of action reveals allegations that defendants 1) denied plaintiffs both substantive and procedural due process; 2) unlawfully "took" plaintiffs' property, although it is not clear whether this "taking" is intended to implicate the due process protections of the Fifth Amendment; 3) unlawfully "seized" plaintiffs' property within the meaning of the Fourth Amendment; 4) interfered with plaintiffs' right to "commercial privileges and immunities enjoyed by all citizens;" 5) subjected plaintiffs to "abuses of process;" 6) denied plaintiffs "equal protection of the laws;" and 7) subjected plaintiffs to public embarrassment and shame in addition to causing damage to plaintiffs' reputations. Plaintiffs' counsel refers to the claims of abuse of process, equal protection, defamation and privileges and immunities as "unstated causes of action" but then argues that "such claims, if proven, would establish denial of substantive and procedural due process, an unlawful taking and an unlawful interference with commerce." Consequently, it is not clear whether plaintiffs intend that these claims should be examined on their merits or disregarded. Viewing plaintiffs' complaint in the most favorable light, the Court finds that the first cause of action alleges various deprivations of federal and constitutional rights which arose when, according to plaintiffs, their property interest in continued participation in the Section 8 housing program was interrupted and/or interfered with by defendants. Thus, before scrutinizing plaintiffs' complaint for actual versus "un-

stated" causes of action, the Court first addresses whether plaintiffs have a cognizable property interest.

■ Property interests are not created by the Constitution; they are defined by independent sources such as federal and state law. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "To have a property interest ... a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it . . . ." *Id.* When determining whether a plaintiff has a claim of entitlement, a court must focus on the applicable statute, contract or regulation that purports to establish the benefit. *See Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 30 (2d Cir.1994).

■ In this case, plaintiffs argue that federal housing assistance legislation as well as the HUD regulations enacted pursuant thereto provide them with a clear entitlement to participation in the Section 8 housing program. In support of this argument, plaintiffs point to 24 CFR 982.306, which sets forth six grounds upon which a public housing agency such as SHA may deny approval to lease a unit from an owner. Among these are breach of an HAP contract, fraud, bribery or other criminal acts in connection with a federal housing program, drug-trafficking, noncompliance with HUD standards for leased units, failure to meet state or local building codes and non-payment of real estate taxes. The crux of plaintiffs' argument is that SHA's discretion to disapprove an owner is "narrowly circumscribed" by this regulation and SHA could therefore withhold approval of their lease applications only if they violated one of the six express-

ly stated grounds in 24 CFR 982.306. Since failure to screen prospective tenants is not one of the six grounds set forth in the regulation, plaintiffs argue that they were entitled to lease approval and that SHA's action in suspending them from the Section 8 program was arbitrary and capricious. Plaintiffs argue that the favorable outcome of their Article 78 proceeding proves that SHA's actions herein were contrary to law.

Plaintiffs' argument is flawed in two respects. First, the question of whether SHA's action was legally defective according to state administrative law is entirely distinct from the issue of whether plaintiffs have a cognizable property interest warranting vindication in a federal § 1983 action.[5] Second, a reading of the relevant regulation itself reveals that it can not reasonably be interpreted as creating a property interest. After setting forth the grounds on which a public housing agency "may" in its administrative discretion deny approval to lease a unit from an owner, 24 CFR 982.306(e) states: "Nothing in this rule is intended to give any owner any right to participate in the program." Thus, the very premise of plaintiffs' argument regarding SHA's "narrowly circumscribed" discretion to disapprove lease applications based on the standards set forth in the regulation is belied by the language of the regulation itself, which was clearly intended to obviate the very construction urged by plaintiffs.

Plaintiffs argue in their memorandum of law that "[t]he First Cause of Action seeks redress only for claims which wrap themselves around a similar set of operative facts and circumstances. Namely, that there is a property interest, that was unreasonably and improperly interfered with

---

5. Indeed, in resolving plaintiffs' New York administrative law complaint, Judge Stone and the Appellate Division merely decided that the basis for SHA's decision to deny plaintiffs future participation in the Section 8 housing program, i.e., failure to screen tenants as required by the HAP contract and HUD regulations, was too narrow and therefore invalid because neither the contract nor the regulations actually require such screening. The decisions do not hold that SHA did not have discretion to refuse to do business with plaintiffs.

...." Thus, plaintiffs concede that all of the claims which constitute the first cause of action depend on a property right which this Court has determined does not exist. Because plaintiffs have failed to establish that they have a cognizable property right or interest in continued participation in the Section 8 housing program, none of the stated or "unstated" claims in the first cause of action are sustainable under 42 U.S.C. § 1983. Having so determined, the Court need not reach the merits of each of these claims individually before dismissing plaintiffs' first cause of action.

### 2. Denial of Equal Protection

■■ Plaintiffs allege in the third cause of action that defendants denied them equal protection under the Constitution by engaging in "discriminatory enforcement" of the laws, also actionable under section 1983. The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Selective enforcement is a "murky corner of equal protection law in which there are surprisingly few cases." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir.1980). To sustain such a claim, a plaintiff must present sufficient evidence for a reasonable inference to be drawn that 1) compared with others similarly situated, plaintiff was selectively treated; and 2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure plaintiff. *Id.* at 609. A plaintiff has an equal protection claim actionable under section 1983 if he proves that defendant(s) "employed their official powers for the purpose of injuring [him], rather than to serve the proper ends of their government duties." *Id.* at 610 (citations omitted).

Plaintiffs' complaint alleges that defendants "created" a municipal policy specifically to discriminate against them. Plaintiffs allege in their complaint that they are the "only landlords or entities ever to be suspended from the Section 8 housing program" for undesirable management practices or failing to screen tenants. Plaintiffs also claim that 1) defendant SHA refused to list their properties on their list of eligible Section 8 rental properties; 2) defendants "over inspected" their properties after they complained to HUD regarding alleged racial discrimination by SHA and at least one of their properties was cited for violations which were never enforced against other landlords; and 3) after plaintiffs hired a management company to manage their Section 8 properties, defendant SHA suspended all of said management company's future Section 8 contracts until it disassociated itself from plaintiffs. Plaintiffs allege that all of these acts were done intentionally with bad faith and with knowledge of the deleterious effect they would have on plaintiffs' rental income and business reputations.

In support of these claims, plaintiffs allege that several exhibits presently before the Court evidence defendants' "specific animus" towards Roth and a "designed intention to cause him the deprivation." The record is replete, however, with documents which indicate that the cycle of this litigation began when neighborhood groups complained to elected officials about troublesome Section 8 tenants who were disrupting quiet residential communities. These elected officials complained to HUD and the City of Syracuse about the concerns of their constituents, prompting the City and SHA to review the Section 8 program. The City and SHA realized that out-of-possession landlords such as Roth did little, if anything, to screen the tenants and that SHA did not have the authority to suspend subsidies for those tenants which became nuisances to surrounding neighbors. SHA and the City began working together to devise strategies to combat the problem and either force land-

lords to screen prospective tenants or eliminate problem landlords from the Section 8 program. These strategies resulted in greater scrutiny of plaintiffs' management practices and eventual denial of plaintiffs' participation in the housing program.

Plaintiffs allege, however, that rather than combating a general problem of troublesome renters and their "laissez-faire" out of possession landlords in the University area, defendants specifically targeted them alone based on malice or animus and/or intent to prevent the low income and minority Section 8 tenants to whom plaintiffs were renting from migrating into predominantly white, owner-occupied residential neighborhoods. Plaintiffs allege that, as evidenced by a memorandum attached to their opposition papers, SHA had a policy in writing which stated that its goal was to "nail" Norman Roth. However, it is apparent that the reference to "nailing" plaintiff was made in a memorandum from an employee of SHA to its director outlining the circumstances of possible fraudulent activity by Roth in cashing a rent subsidy check for a vacant apartment.[6] The memorandum also advises that another of Roth's properties was scheduled for inspection after a records check revealed that the last inspection had been completed nearly one year before. There is no evidence in this memorandum that defendant SHA or the City of Syracuse targeted plaintiff arbitrarily out of spite or in bad faith. Indeed, the balance of the memorandum primarily addresses the frustration of both SHA and the City in dealing with what is described as the "Norman Roth *type* of issue," that is, problematic tenants coupled with "slumlords." (Emphasis added.)

This general frustration is also reflected in another document relied on by plaintiffs in support of their allegations that they were selectively scrutinized by defendants. In a March 14, 1997, memorandum, Murphy told Kresser that he had received a complaint from city councilwoman Nancy McCarty regarding "Section 8 recipients" who were apparently renting property in proximity to one of her constituents. Murphy stated:

> The problem that bothered me then and still does is that we seem to have little or no control over troublesome Section 8 tenants and their landlords. It seems to me that there must be some solution for the Norman Roths of this world who cannot screen an elephant if *they* had to let alone evict one for destroying the neighborhood, especially if we keep the cash flow running. We at least have a moral burden not to subsidize jerks especially when there are *so many* Norman Roths of the world out there who will rent to them. What does Rochester do? Lets develop some solutions .... (Emphasis added.)

These documents suggest that rather than being the individual target of any action by SHA and the City, Roth was merely a primary example of a city-wide problem which defendants were attempting to combat through greater scrutiny of Section 8 landlords' rental practices.

Plaintiffs allege that Kresser "ordered" an inspection of one property when none

---

**6.** Indeed, the memorandum at issue details complaints received by SHA from defendant Sciscioli after he attended a neighborhood meeting where residents of Greenwood Place were complaining about tenants occupying one of Roth's properties. In the course of relaying these complaints to defendant Terry Kresser, Kresser told the author of the memorandum (an SHA employee named "Joy") that a tenant of Roth's had vacated her apartment in August 1997 and that he had not informed SHA of her moving out. "Joy" relayed to defendant director Murphy in the memorandum that Kresser said he was waiting "with baited breath" to verify that Roth cashed the rent subsidy check forwarded to him for this vacant apartment for the month of September in which case SHA could "nail" him for this issue.

was required by statute or SHA policy, without any reference to the dates on which the property in question was last inspected or was scheduled to be inspected again. Indeed, the documents attached to Murphy's affidavit on which plaintiffs rely to show that the inspection in question was a "surprise" undertaken prior to the anticipated date of the annual inspection indicate that SHA must inspect rental properties "prior to the initial occupancy of the unit *and at such other time (including the annual inspection)* as may be necessary to assure that the owner is meeting his obligation to maintain the unit in a safe, decent, sanitary condition." (Emphasis added.) Thus, it appears that SHA had discretion to inspect Section 8 properties at any time deemed necessary to assure program compliance.[7] The statements in Roth's affidavits regarding "being placed under extreme scrutiny" and being "over inspected" are plainly conclusory assertions with no factual support in the record.[8] Moreover, plaintiffs' allegations regarding building code violations enforced by defendants exclusively with respect to his properties is equally conclusory. Nowhere does plaintiff Roth identify the regulation(s) at issue nor does he state whom or how many other Section 8 landlords were guilty of the same conduct or condition.

7. Plaintiffs have sued defendant Kresser on the basis that he ordered this "surprise" inspection in violation of their constitutional rights. Kresser denies these allegations. Murphy avers that he, not Kresser, ordered the inspection in question based on reports SHA received of unsanitary and unsafe conditions existing on the property. In light of the Court's determination that the unchallenged documentary evidence indicates SHA had discretion to inspect Section 8 properties at any time, however, it need not reach the merits of this dispute. .

8. Furthermore, plaintiff Roth's statement that it "has been reported to [him]" that defendants Bernardi and Sciscioli thought these "heavy handed" policies would get Roth to "back off" are simply bald conclusory allegations.

Roth further avers that at a meeting between Mayor Bernardi and members of a neighborhood group, the Mayor "made it clear ... that he was sympathetic" to the group's complaints. Even if true, this allegation does not indicate that the Mayor had specific animus toward plaintiffs. Roth also avers that Kresser "refused to include [his] properties on SHA's list of available units for Section 8 tenants" and that he was the "only landlord" who was denied participation in the Section 8 program for failure to screen tenants. These statements are devoid of any factual support or context. Regarding the former, Roth does not state the criteria SHA used for listing available rental properties, whether his properties met said criteria, and whether other owners' properties were also excluded from the list.[9] With respect to the latter, no one could reasonably conclude that plaintiff Roth was singled out for suspension in the absence of evidence which demonstrates either that there were other Section 8 landlords who failed to screen tenants but to whom defendant SHA nonetheless granted continued participation in the program or that although landlords were suspended from participation in the Section 8 housing program for various reasons, plaintiff Roth was the only one ever to be suspended for failing to screen tenants. The Court finds Roth's

9. Defendant Murphy acknowledges that at one time he instructed defendant Kresser that plaintiffs' properties "need not be included in the listing" of available properties and then later advised Kresser to place these properties back on the listing. While this admission establishes that plaintiffs' properties were at one time not on the list of available properties compiled by SHA for reasons not apparent from the record, plaintiffs' bald accusations regarding SHA's "refusal" to list their properties without more is not sufficient to establish that plaintiffs were treated differently than other Section 8 landlords or that the alleged refusal was motivated by animus or bad faith. Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *Anderson,* 477 U.S. at 258, 106 S.Ct. 2505.

mere conclusory allegation of these facts insufficient to withstand summary judgment.[10]

In any event, even assuming that plaintiffs presented sufficient evidentiary facts to support their assertion that they were selectively treated compared with other landlords, the record is devoid of evidence supporting the second element of a claim of selective enforcement, i.e., that the selective treatment was based on impermissible considerations. Roth's claim that defendants targeted him for "selective enforcement" based on a policy of "racial gerrymandering" is devoid of merit. Roth states that "it is clear to [him] that the City has a policy or practice of keeping Section 8 tenants in certain parts of the City, namely the south and west sides."[11] Roth's allegation that Mayor Bernardi "reportedly" stated during an August 1997 meeting between the City and interested landlords that "it would be better" to have students living in the University area rather than "Section 8's" is not based on Roth's personal knowledge. Moreover, the statement does not show racial animus even if the Court accepts plaintiffs' factually unsupported theory that most Section 8 tenants are minorities.

Plaintiffs' complaint further alleges that the City's race/economic policy resulted in SHA's disapproval of Section 8 leases for apartments which plaintiffs own in the University area and suspension of their tenants from the Section 8 housing program. As an example, Roth avers that after he evicted a former tenant for failure to comply with the terms of her lease, SHA placed the tenant in a public housing project on the south side of the City. Roth states that after another of his tenants was unable to secure approval of a lease to rent one of his apartments from SHA, SHA offered her an apartment in the Central Village Housing Development on the City's south side. These allegations are not in themselves race-related, and, even if the Court makes the broad assumption that the tenants Roth refers to in these instances were minorities, the allegations provide no factual support for plaintiffs' conclusory claim of race discrimination. Absent knowledge of the circumstances surrounding these tenants' placement in public housing projects, no rational trier of fact could determine whether either SHA or the City was motivated by race in making

10. The Court finds likewise with respect to plaintiffs' allegation in the complaint that upon their retention of Highlander Associates, Ltd., a professional management company, defendant SHA "suspended all of Highlander's future Section 8 contracts until they disassociated themselves with Plaintiff." There are no other facts regarding this conclusory allegation set forth in the complaint nor do plaintiffs address this claim in their opposition papers. Although a non-moving party need not produce evidence in a form that would be admissable at trial to avoid summary judgment, the party cannot rest on the pleadings but must set forth specific facts in affidavits, depositions, answers to interrogatories or admissions showing there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The Court is not constrained to relieve plaintiffs of this burden simply because defendants' dispositive motions were served in lieu of answering the complaint and there has been no discovery to date. A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, and reply affidavits in support of and in opposition to a motion to dismiss. In re *G. & A. Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985) (citations omitted).

11. Although the verified complaint alleges that defendants were motivated by racial animus in directing low income, predominantly minority tenants away from plaintiffs' apartments in predominantly white neighborhoods, the affidavits submitted by Roth in opposition to defendants' motions do not identify any of his tenants, past or present, as minorities. The statements in Roth's affidavits relate solely to the alleged treatment of "Section 8's." Although plaintiffs' attorney suggests in his affidavit and in plaintiffs' memorandum of law that defendants harassed, intimidated and erected administrative hurdles for existing and prospective African American tenants of Roth, there is no admissible evidence in this record from which the Court can conclude that the Section 8 tenants Roth refers to in his affidavits are minorities.

these placements.[12]

In the absence of any evidence suggesting that defendants were motivated by malicious intent, bad faith or race discrimination in scrutinizing plaintiffs' management practices or suspending them from the Section 8 housing program, plaintiffs' third cause of action based on violation of their constitutional right to equal protection must fail. The paucity of evidence in the record which suggests that plaintiffs were "treated differently" as they allege "does not, in itself, show malice." *Zahra v. Town of Southold,* 48 F.3d 674, 684 (2d Cir.1995) (citing *LeClair,* 627 F.2d at 610).

12. Roth also alleges that 1) one of his tenants was the subject of an undercover drug bust by the Syracuse Police Department and subsequently lost her rent subsidy; 2) this tenant subsequently signed an agreement with defendant SHA's attorneys to vacate the apartment she had rented from Roth; 3) another tenant was suspended from the Section 8 housing program for various reasons and Roth was forced to evict her for non-payment of rent; and 4) this same tenant's apartment was "serendipitously" cited as a "public nuisance" by the Chief of Police. These allegations appear to be an attempt to suggest some sort of conspiracy between defendants and the Syracuse Police Department in targeting plaintiffs' tenants on code and law enforcement issues. However, these allegations standing alone bear no relationship to the issues at bar. Furthermore, each of these incidents occurred after plaintiffs filed the present lawsuit.

Finally, plaintiffs' allege in the complaint that defendants conspired to utilize uniformed City of Syracuse police officers to conduct inspections of plaintiffs' properties and that on one occasion these officers "chased" a prospective minority tenant away from viewing one of plaintiffs' properties. There is no mention of these alleged incidents in plaintiffs' opposing affidavits or evidentiary materials. This paragraph of the complaint standing alone does not establish any material fact which would preclude an award of summary judgment. Assuming the allegations to be true as the Court must for the purpose of the present motions, there is no evidence that plaintiffs' properties were the only Section 8 rental properties inspected by uniformed police officers nor does plaintiff make this accusation. Furthermore, even if police officers did on one occasion "chase away" their prospective minority tenant as suggested by plaintiffs, the allegation with absolutely no

A plaintiff cannot establish an equal protection violation based on selective enforcement simply by showing that a regulation or policy was not enforced against others similarly situated. *See id.; accord Puglisi v. Underhill Park Taxpayer Assoc.,* 947 F.Supp. 673, 705 (S.D.N.Y.1996). "After all, 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation,' as long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " *LeClair,* 627 F.2d at 611 (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)).[13]

factual context does not establish that the officers did so because the prospective tenant was a minority or because he or she was attempting to lease an apartment from plaintiffs. While these allegations in the complaint are not wholly conclusory, they fall far short of providing specific facts tending to demonstrate the ultimate required legal conclusion in this case—that is, that the landlord plaintiffs were treated differently than other Section 8 landlords based on some impermissible standard such as racial animus or malice. *LeClair,* 627 F.2d at 611 (citations omitted).

13. The Court is not constrained in its determination by the recent case of *Village of Willowbrook v. Olech,* —— U.S. ——, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (U.S.) in which the Supreme Court held that a complaint by a plaintiff "class of one" who alleged that he or she was treated differently from others similarly situated and that the difference in treatment was "irrational and wholly arbitrary" was sufficient to state a claim for relief under the equal protection clause and thereby withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In the first instance, the present motions to dismiss were converted to summary judgment motions pursuant to Rule 12(b) thus requiring plaintiffs to set forth specific facts in support of their claims rather than merely relying on the bare allegations of the complaint. Moreover, the question of whether plaintiff Roth, as a "class of one," is entitled to prosecute an equal protection claim is not in dispute here. Rather, the issue is whether plaintiffs have demonstrated dispute of a material fact tending to show that plaintiffs were indeed treated differently by defendants than other Section 8 landlords and that the difference in treatment was based on intentional and arbitrary discrimination. Based on this Court's review of

### C. *Plaintiffs' Fair Housing Act Claim*

■ In enacting the Fair Housing Act, Congress declared: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Act was designed to prohibit discrimination in the sale, rental, financing or brokerage of both private and public housing and to provide federal enforcement procedures for remedying such discrimination. *Otero v. New York City Housing Auth.,* 484 F.2d 1122, 1133–34 (2d Cir.1973). The Act provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the Act. 42 U.S.C. § 3617. Plaintiffs' complaint alleges that SHA scrutinized their tenants, refused to approve leases submitted by their tenants and eventually suspended them from the Section 8 housing program because defendants wished to prevent minorities from renting the apartments they owned in primarily white residential neighborhoods. Plaintiffs allege that these acts violated the Fair Housing Act by interfering with these tenants' rights to participate in a federal housing program and obtain rent subsidies.

In support of their claim of racial animus by defendants, plaintiffs direct the Court to the administrative complaint Roth filed with HUD setting forth the basis of his Fair Housing Act claim. The administrative complaint in question, prepared by plaintiffs' former attorney, Bruce Roswig, is unverified and does not include or make reference to any sworn affidavits or other evidence in admissible form. Furthermore, rather than addressing the specific manner in which he alleged that SHA interfered with the fair housing rights of Roth's tenants, either current or prospective, the administrative complaint purports to describe a general city-wide discriminatory policy by SHA of keeping minority Section 8 tenants in areas with high concentrations of minorities and poverty.[14]

To state a claim under the Fair Housing Act, plaintiffs must allege and show that defendants engaged in the prohibited conduct of coercing, intimidating, threatening or interfering with them and their right to aid or encourage their minority tenants in the exercise of their rights under the Act. *See Puglisi,* 947 F.Supp. at 706–707. Plaintiffs have produced no evidence of any racial animus by defendants toward any of plaintiffs' tenants, past, present or prospective.[15] Further, plaintiffs have

the record, plaintiffs have not so demonstrated.

**14.** To wit, plaintiffs alleged that by first refusing to include Roth's apartments on lists of available subsidized housing units available for rental by prospective tenants and then by suspending Roth from participation in the Section 8 housing program, SHA prevented minorities from exercising their rights to rent apartments in areas of low poverty and minority concentration. Attached to the HUD complaint are unverified census tract maps purporting to show concentrations of minority and low income families in the City of Syracuse and the location of Roth's available apartments as compared to the apartments on SHA's "list." To the extent that plaintiffs rely on the legal rights of minority tenants who might have rented apartments from them had they known they had apartments available or had they not been suspended from the hous-

ing program, it is doubtful whether plaintiffs have standing under the Fair Housing Act to make this claim. A plaintiff may only assert the constitutional rights of others when a defendant's action adversely affects an existing relationship between plaintiff and the third party. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The relationship between plaintiffs and any prospective tenants is extremely attenuated, if it exists at all.

**15.** Plaintiffs' above-referenced allegation that uniformed police officers in conspiracy with defendants "chased away" a prospective minority tenant from viewing one of their properties is insufficient standing alone to establish that defendants were motivated by racial animus toward this tenant or that they attempted to interfere with said individual's Fair Housing Act rights.

failed to produce any evidence that the alleged discriminatory policies and procedures which defendants have imposed on them have had a disparate impact on their minority tenants' ability to obtain fair housing. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–36 (2d Cir.1988). For the same reasons that plaintiffs' claim of "racial gerrymandering" by defendants in violation of the Equal Protection Clause fails, their Fair Housing Act claim fails as well.

### CONCLUSION

Based on the foregoing, plaintiffs' first and third causes of action under 42 U.S.C. § 1983 are hereby dismissed. Plaintiffs' second cause of action under the Fair Housing Act (42 U.S.C. § 3601 *et seq.*) is also dismissed. Having dismissed all of plaintiffs' federal claims and there being no basis for the Court to exercise diversity jurisdiction over the parties, the Court declines to exercise its pendent jurisdiction to entertain plaintiffs' remaining state law claims. Thus, defendants' motions to dismiss plaintiffs' complaint is hereby GRANTED.[16]

Accordingly, it is hereby

ORDERED that defendants' motions are granted, and it is further

ORDERED that the complaint is dismissed in its entirety.

IT IS SO ORDERED.

---

**16.** Plaintiffs argued in the first instance that it is premature for the Court to entertain defendants' dispositive motions prior to resolving the alleged *Dunton* conflict in this case between the individual and "municipal" defendants. In *Dunton v. County of Suffolk,* 729 F.2d 903, 907 (2d Cir.1984), the Second Circuit recognized that after the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that municipalities may be liable under 42 U.S.C. § 1983 for employees' actions taken pursuant to municipal policy), "the interests of a municipality and its employees as defendants in a section 1983 action are in conflict." While there may arguably be, as plaintiffs contend, a *Dunton* conflict as between the City of Syracuse and Bernardi and Sciscioli, who are employed by the City, there is no such conflict with respect to the Syracuse Housing Authority or any of its employee defendants as the Syracuse Housing Authority is not a municipal entity. However, the entire issue of alleged conflicts of interests between defendants is rendered moot by virtue of the fact that Court has herein dismissed the complaint in its entirety as against all defendants.