MUSCO PROPANE, LLP, Plaintiff,

v.

TOWN OF WOLCOTT,
et al., Defendants.

Civil Case No. 3:10–cv–1400 (JCH).

United States District Court,
D. Connecticut.

Aug. 30, 2012.

Eric M. Grant, Melissa A. Scozzafava, Pasquale M. Salvatore, Yamin & Grant, Waterbury, CT, for Plaintiff.

Johanna G. Zelman, Melinda A. Powell, Michael J. Rose, Rachel L. Ginsburg, Robin B. Kallor, Hartford, CT, for Defendants.

RULING RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 103, 104, 105, 108, 110, 111, 112 & 113) AND DEFENDANTS' MOTIONS TO DISQUALIFY PLAINTIFF'S EXPERTS (DOC. NOS. 106, 107 & 109)

JANET C. HALL, District Judge.

I. INTRODUCTION

Plaintiff Musco Propane, LLP ("Musco"), brings this suit, pursuant to 42 U.S.C. § 1983, against the Town of Wolcott ("Wolcott"); Wolcott's Planning and Zoning Commission ("PZC"); Wolcott's Zoning Board of Appeals ("ZBA"); Wolcott's Mayor, Thomas Dunn ("Mayor Dunn"); Wolcott's Zoning Enforcement Officer, David Kalinowski ("ZEO Kalinowski"); five individual members of the PZC in 2009 and 2010; and four individual members of the ZBA in 2009 and 2010. Each of the individual defendants is sued in both his or her official and individual capacities. Musco claims that each of the defendants (1) violated its right to equal protection, and (2) retaliated against it in violation of its First Amendment right to freedom of speech.

Currently pending before the court are eight separate motions for summary judgment filed by the defendants, as well as three motions to disqualify the plaintiff's expert witnesses and preclude their testimony. For the following reasons, the Motions for Summary Judgment are granted. Consequently, the Motions to Disqualify Plaintiff's Experts are denied as moot.

II. BACKGROUND

A. *2006 Tank Approval*

In 2006, Musco applied to install a 30,-000 gallon above-ground, propane storage tank on its property located at 585 Wolcott Road. Am. Compl. (Doc. No. 70) ¶ 22; Answer (Doc. No. 71) ¶ 22. Attached to Musco's application was a handwritten statement describing its proposed use of the tank. Defendants' 56(a)(1) Statement of Undisputed Facts (Doc. No. 114) ("Defs.' 56(a)(1) St.") ¶ 3; Plaintiff's Statement of Disputed Issues of Material Fact (Doc. No. 124) ("Pl.'s St. Disputed Issues") ¶ 7. The statement read, in relevant part: "My use of intent is to install a 30,000 gallon LP

propane bulk tank for loading our propane tanks for deliveries thru out our service area." Pl.'s Ex. 4 at 4.[1]

While Permitted Use Section C–17 of the Wolcott Zoning Regulations allows for "[r]etail sale and distribution of a heating fuel and natural gas" in the town's General Commercial Zone, "storage tanks having a capacity in excess of 10,000 gallons" are specifically excluded. Pl.'s Ex. 3 ("Zoning Regs.") at Schedule A, p. 8. Thus, installation of the 30,000 gallon tank proposed by Musco was not permitted under the Regulations. Nevertheless, following a public hearing, the PZC approved Musco's application. Am. Compl. ¶ 24; Answer ¶ 24. A building permit was issued on July 17, 2006. Am. Compl. ¶ 30; Answer ¶ 30. Musco received a Certificate of Occupancy on December 28, 2006, Am. Compl. ¶ 32; Answer ¶ 32, as well as a Certificate of Compliance issued by the ZEO, which stated that an inspection had been made at 585 Wolcott Road and that the property was in compliance with the Wolcott Zoning Regulations, Am. Compl. ¶ 33; Answer ¶ 33.

### B. 2009 Application for Second 30,000 Gallon Tank

In the spring of 2009, Musco applied for permission to install a second 30,000 gallon, above-ground propane storage tank to be located directly behind the existing tank. Am. Compl. ¶ 46; Answer ¶ 46. On April 16, 2009, ZEO Kalinowski sent a letter to the State of Connecticut Department of Transportation ("DOT"), enclosing Musco's site plan for the second tank and asking for "input in regards to traffic concerns that had been brought to [the PZC's]

attention during the Public Hearing on April 15, 2011, in the Wolcott Council Chambers." Am. Compl. ¶ 50; Answer ¶ 50; Pl.'s Ex. 17. The letter noted that "[t]he stored propane will be sold for wholesale use for other companies as well as use for Musco Fuel customers." Pl.'s Ex. 17. According to Musco, before a public hearing was held on its application, it "was abruptly notified that the 2009 Tank Application would likely be denied based upon a 'recently discovered' zoning regulation prohibiting fuel storage tanks in excess of 10,000 gallons." Am. Compl. ¶ 52. Musco was also told that approval of its 2006 application had been granted in error. Am. Compl. ¶ 53; Answer ¶ 53. Musco subsequently withdrew the 2009 application. Am. Compl. ¶ 54; Answer ¶ 54.

### C. Randy Petroniro's Election to Wolcott Town Council

Randy Petroniro is a 50% owner of Musco. Pl.'s Ex. 57 ("Petroniro Dep.") at 1:15. According to Petroniro, he became involved in Wolcott politics in June 2009. Id. at 6:9–14. He was elected to the Town Council in November 2009. Am. Compl. ¶ 44; Answer ¶ 44.

### D. Resident Complaint Regarding 2006 Tank Approval & Subsequent Investigation

At a Wolcott Town Council Meeting on October 6, 2009, Wolcott resident Adolph Birkenberger stated that the Planning and Zoning Commission had violated Section 23. 2.4 of the Town Zoning Regulations by approving the installation of a 30,000 gallon fuel tank by Musco. Defs.' 56(a)(1) St. ¶ 176; Plaintiff's Local Rule 56(a)(2) State-

---

1. Pursuant to Section 52.6.5 of the Wolcott Zoning Regulations, "[a]ny maps, plans, documents, statements and stipulations submitted to and approved by the Commission, and any conditions of approval attached, shall be conditions for issuance of a Zoning Permit and a Certificate of Zoning Compliance by the Zoning Enforcement Officer." Pl.'s Ex. 3 at p. V–12.

ment (Doc. No. 124) ("Pl.'s 56(a)(2) St.") ¶ 176. Birkenberger formally requested an investigation by the Town Council of Mayor Dunn and the PZC. *Id.*

In January 2010, the Chairman of the Town Council, Michael Santagotta, formed a three-member subcommittee to investigate the PZC's granting of Musco's 2006 application. Defs.' 56(a)(1) St. ¶ 178; Pl.'s St. Disputed Issues ¶ 56.

### E. *2010 Tank Applications*

In January 2010, Musco re-submitted its application for the installation of a second 30,000 gallon, above-ground propane storage tank ("the 30K Tank Application"). Am. Compl. ¶ 65; Answer ¶ 65. Musco also submitted an alternative application for the installation of four 10,000 gallon, above-ground propane storage tanks (the "10K Tanks Application"). Am. Compl. ¶ 66; Answer ¶ 66. Finally, it proposed an amendment to the Zoning Regulations to allow for propane storage tanks up to 30,-000 gallons ("the Text Amendment Application"). Am. Compl. ¶ 67; Answer ¶ 67.

ZEO Kalinowski declined to put the 30K Tank Application on the agenda for the PZC's February 3, 2009 meeting, because he believed a 30,000 gallon tank was prohibited by the Wolcott Zoning Regulations. Pl.'s Ex. 23 ("Feb. 3 PZC Minutes") at 3. Nevertheless, Musco's attorney appeared at the meeting and formally requested that the 30K Tank Application be added to the agenda. *Id.* The PZC unanimously voted to accept the 30K Tank Application for review. *Id.* at 5.

The minutes from the February 3, 2009 PZC meeting reflect that, during the discussion of Musco's applications, members of the PZC questioned Musco's attorney about whether Musco was engaged in purely retail or both retail and wholesale propane sales:

Cathe Sherman said [Permitted Use Section] C–17 specifically talks about retail sales and is this retail sales for Wolcott or are you talking wholesale. . . . Attorney Salvatore said there is retail and wholesale as there has been since 2006 and that's why when the 2009 application was submitted there was a concern from the Commission and various neighbors that it would be dangerous for trucks to be entering and exiting the area. Cathe Sherman said C–17 clearly states it is for retail sales, no wholesale is permitted in these regulations. Vanessa Malena said if you look at [Permitted Use Section] C–16 it doesn't pertain directly to fuel but says warehousing and wholesale businesses are permitted. Ray Mahoney said that he saw the letter from Randy (Petroniro) stating that (the existing tank) it was going to be used for retail and in fact is using it as wholesale and that wasn't what he requested in 2006.

*Id.* at 4. The PZC subsequently voted to deny both the 30K Tank and Text Amendment Applications. *Id.* at 5–8. It accepted the 10K Tanks Application for review but reserved decision. *Id.* at 5. Musco appealed PZC's decision on the 30K and Text Amendment applications to the Connecticut Superior Court on February 26, 2010. Pl.'s Ex. 27; Pl.'s Am. Compl. ¶ 76; Answer ¶ 76.

### F. *Letter from Mayor Dunn to PZC*

Mayor Dunn was present at the February 3 PZC meeting and distributed a letter to the PZC members, which was signed by Town Council Chairman Santagotta and himself and dated January 27, 2010. Feb. 3 PZC Minutes at 1, 3, 11. According to Town Attorney William Tynan ("Attorney Tynan"), he drafted this letter at the request of Chairman Santagotta as a response to the complaint made by Adolph Birkenberger at the October 2009 Town

Council meeting. Defs.' Ex. L ("Tynan Dep.") at 52–53.

The letter stated that it "ha[d] come to [the Mayor's and Chairman's] attention that the Planning and Zoning Commission had approved a Special Use Permit for Musco Fuel approximately three years ago for the installation of a propane tank in contravention of the Planning and Zoning Regulations."[2] Feb. 3 PZC Minutes at 10. The letter requested that the PZC "adhere to its regulations." *Id.* The letter further noted that the PZC "cannot vary its own regulations" and that any "request for variance . . . should be properly submitted to the Zoning Board of Appeals for their consideration." *Id.* Finally, the letter closed with the following paragraph:

> Your Commission is also cautioned to be very careful as to what is said during public meetings. Specifically, a reference was made to the prior application being granted incorrectly. All members should be advised that any comments such as that can show: 1. A predetermination of any pending applications and also: 2. Does not generate confidence in the Commission as viewed by the general public.

*Id.* at 11.

### G. *Letter from Town Planner Panico to ZEO Kalinowski*

On February 11, 2010, Wolcott Town Planner Tony Panico wrote a letter to ZEO Kalinowski stating that, at Kalinowski's request, he had "reviewed [his] comprehensive plan materials and refreshed [his] memory relative to the particular zoning regulations" pertaining to "the bulk storage of fuels and similar products." Pl.'s Ex. 26 ("Panico Letter") at 1. Panico wrote that the "Commission at that time the zoning regulations were redrafted did not want 'tank farms' in Wolcott," and that, as a result, they included a "specific *prohibition* of bulk fuel storage tanks with a capacity in excess of 10,000 gallons *anywhere* in town." *Id.* (emphasis in original). Panico also argued that Permitted Use Section C–16, which allows for "[w]arehousing and wholesale businesses, including commercial storage and self-storage facilities," Zoning Regs. at Schedule A, p. 8, was "not intended to include the bulk storage of fuel or petroleum products," which was more specifically addressed in Permitted Use Section C–17. Panico Letter at 2.

Finally, Panico noted that "[t]here is nothing [in Section C–17] that limits a business to only one tank" and acknowledged that "[c]onceivably a business could have more than one tank if their needs justified it and they could adhere to all necessary site Development Plan requirements as to setbacks, screenings, containment provisions, landscaping, access, circulation, parking, etc. etc." *Id.* However, he did not believe "a 'tank farm' of 10,000 gallon tanks would be consistent with this permitted use line and the zoning regulations in general." *Id.*

### H. *Letter from Attorney Tynan to ZEO Kalinowski*

On March 15, 2010, Attorney Tynan wrote a letter to ZEO Kalinowski stating that he believed Kalinowski was "well

---

2. Musco's permit had not, in fact, been a "Special Use Permit." Under Section 23.1 of the Wolcott Zoning Regulations, certain uses require Special Use Permits, while others are permitted as of right, subject to submission and administrative approval of a Site Development Plan." Zoning Regs. at p. II–3. Retail sale and distribution of heating fuel and natural gas falls into the latter category. *Id.* at Schedule A, p. 8. Thus, Musco had to have a Site Development Plan approved by the PZC in 2006, but it did not require a Special Use Permit.

within [his] authority to use a cease and desist order or a stop work order associated with Musco's wholesaling operation." Pl.'s Ex. 28 ("Tynan Letter"). He further stated that his "understanding from the initial application of Musco Fuel [was] that [it] filed the Special Use Permit for the 30,000 gallon propane tank based solely on [its] own retail operations," and that "[in] no event was it envisioned that [Musco] would be wholesaling to other propane companies." *Id.*

### I. *Issuance of Cease and Desist Order*

ZEO Kalinowski presented both Panico's and Tynan's letters to the PZC at the PZC's March, 22, 2010 meeting. Pl.'s Ex. 48 ("Mar. 22 PZC Tr.") at 4. He noted that he could take a variety of steps to address Musco's wholesaling activities, including the issuance of a stop work order, a violation letter, or a cease and desist order. ZEO Kalinowski recommended issuing a cease and desist order, because it would result in a speedier resolution of the dispute. *Id.* at 5: 22–27.

Under the Wolcott Zoning Regulations, the ZEO holds the authority to issue cease and desist orders. Defs.' 56(a)(1) St. ¶ 9; Pl.'s 56(a)(2) St. ¶ 9. Accordingly, Kalinowski stated that he didn't need a motion from the PZC to go ahead with issuing an order and that he was "just looking for direction." Mar. 22 PZC Tr. at 8:27, 9:1–3. Chairman Mahoney and PZC Commissioner Zotto both indicated that they agreed with the issuance of a cease and desist order. *Id.* at 11:1–5. No other board member appears to have made a recommendation one way or the other.

Later that same day, Kalinowski issued a cease and desist order instructing Musco "to stop all wholesale of propane being conducted on property located at 585 Wolcott Road to come into compliance with the original statement of use [attached to Musco's 2006 application] and the Town of Wolcott Zoning Regulations." Pl.'s Ex. 31 ("Cease and Desist Order") at 2.

On April 7, 2010, Musco appealed the Cease and Desist Order to the ZBA. Am. Compl. ¶ 89; Answer ¶ 89. A public hearing on the appeal was scheduled for June 9, 2010. *Id.*

### J. *Public Hearing on 10K Tanks Application*

On April 7, 2010, the PZC opened a public hearing on Musco's application to install four 10,000 gallon tanks at 585 Wolcott Road. Am. Compl. ¶ 91; Answer ¶ 91. During the public hearing process, Musco presented testimony that, by propane industry standards, it did not qualify as a wholesaler because it was not selling from a pipeline or other terminal. Pl.'s Ex. 60 at 4: 3–10. PZC Chairman Mahoney argued that wholesaling under the Wolcott Zoning Regulations was "[w]hen you sell something and you make a profit on it and then that person turns around and sells it to somebody else." *Id.* at 6: 24–26; 7: 1–2.

On May 19, 2010, the PZC voted to deny the 10K Tanks Application. Am. Compl. ¶ 102; Answer ¶ 102. In moving to deny the application, PZC Commissioner Carmody listed several reasons the application should not be approved, including, inter alia, that it "did not promote an aesthetic quality of development consistent with the traditional image of Wolcott," that "safe circulation of traffic could not be obtained at all times," and that "the expansion of bulk storage tanks was more for a use that is not permitted in Schedule A than it was to expand the operations of Musco Fuel as a retailer." Pl.'s Ex. 40 at 1: 5–27; 2: 1–2.

Musco appealed the denial of the 10K Tank Application to the Connecticut Supe-

rior Court on June 22, 2010. Am Compl. ¶ 106; Answer ¶ 106.

### K. *Appeal of Cease and Desist Order to ZBA*

On June 9, 2012, the ZBA held a public hearing on Musco's appeal of the Cease and Desist Order. After the hearing, on July 28, 2010, Attorney Michael Tansley sent an advisory letter to the ZBA regarding the appeal. Pl.'s Ex. 44 ("Tansley Letter") at 1. Attorney Tansley summarized the dispute over "whether [Musco's] sale of propane to propane retailers constituted retail or wholesale sales," *id.* at 4, and "submitted that the Board should afford the common, usual, and ordinary meanings to the words retail and wholesale in this appeal." *Id.* at 5; *see also* Zoning Regs. at p. I–5 ("Other words used in these Regulations shall have the meaning commonly attributed to them."). Tansley went on to provide several definitions of wholesale and retail from various dictionaries and judicial decision to guide the ZBA's analysis. Tansley Letter at 6–7.

Tansley noted that he disagreed with Town Planner Panico's position that Permitted Use Category C–16, which allowed "[w]arehousing and wholesale businesses," did not pertain to wholesale fuel distribution. *Id.* at 8 n. 3. Thus, he concluded that "any wholesale business operation was permitted as of right in [a General Commercial Zone], subject to obtaining site plan approval." *Id.* at 8. The question for the ZBA, in Tansley's opinion, was whether the statement of use attached by Musco to its 2006 application, which provided that the tank would be used "for loading our propane tanks for deliveries thru out our service area," suggested that the property would be used only for retail sales "or whether it also included the wholesale sales of propane as permitted under [Section] C–16." *Id.* at 8. In other words, the ZBA needed to determine "the use for which the site plan was actually approved." *Id.* at 9.

The ZBA upheld the Cease and Desist Order on August 9, 2010. Am. Compl. ¶ 114; Answer ¶ 114. Musco appealed the ZBA's decision to the Connecticut Superior Court on August 19, 2010. Am. Compl. ¶ 119; Answer ¶ 119.

### L. *2011 Wholesale Application*

On August 18, 2010, Musco sent a letter to ZEO Kalinowski asking that its 2006 Site Plan Approval "be modified to include wholesale sales of propane in accordance with the Wolcott Zoning Regulations' Permitted Use Section C–16." Pl.'s Ex. 53. Musco maintains that it never received a response to this request. Pl.'s St. Disputed Issues ¶ 142. It subsequently filed a formal Site Plan Application for wholesale propane sales on January 31, 2011. Am. Compl. ¶ 124; Answer ¶ 124. The PZC voted to deny the application at a meeting on March 16, 2011, on the ground that Permitted Use Section C–17 was "more applicable." Pl.'s Ex. 54.

### III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *In re Dana Corp.*, 574 F.3d 129, 151 (2d Cir.2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Id.* In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See*

*Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 274 (2d Cir.2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." *United Transp. Union v. Nat'l R.R. Passenger Corp.,* 588 F.3d 805, 809 (2d Cir.2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment ... must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed.R.Civ.P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)); *see also Havey v. Homebound Mortg., Inc.,* 547 F.3d 158, 163 (2d Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## IV. DISCUSSION

### A. *First Amendment Retaliation Claims*

■ To establish a First Amendment retaliation claim, a plaintiff must show that "(1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused [the] defendant's actions." *Dougherty v. Town of North Hempstead Bd. of Zoning,* 282 F.3d 83, 91 (2d Cir.2002). The defendants argue that a plaintiff must also demonstrate that its speech was "actually chilled" as a result of the defendant's conduct. *See* Memorandum of Law in Support of Defendant Town of Wolcott's Motion for Sum-

mary Judgment (Doc. No. 113–1) ("Wolcott Mem. Supp.") at 24 (citing *Kuck v. Danaher,* 600 F.3d 159, 168 (2d Cir.2010)). Musco counters that a demonstration of "actual chill" is not required where a retaliation claim is "based upon the misapplication of a zoning code." *See* Plaintiff's Combined Memorandum of Law in Opposition to All Defendants' Motions for Summary Judgment (Doc. No. 123) ("Pl.'s Mem. Opp'n") at 17 (citing *Gill v. Pidlypchak,* 389 F.3d 379, 383 (2d Cir.2004)). The court finds it unnecessary to resolve this disagreement, because the plaintiff has failed to establish a disputed issue of material fact as to whether its protected conduct "prompted or substantially caused" any of the defendants' adverse actions. Thus, Musco's retaliation claims fail regardless of whether an "actual chill" requirement is imposed.

■ Musco argues that it was retaliated against both as a result of Petroniro's election to the Town Council in November 2009, and as a result of its decision to appeal the denial of its 30K Tank and Text Amendment Applications to the Connecticut Superior Court in February 2010. In support of both claims, Musco relies heavily on the temporal proximity between its protected activity and the defendants' adverse actions. Pl.'s Mem. Opp'n at 19 ("Specifically, the temporal proximity of the defendants' conduct to Musco's exercise of its First Amendment rights is sufficient to support a causal connection strong enough to survive a motion for summary judgment.").

With respect to Petronino's election to the Town Council, Musco points out that "[i]mmediately after Randy Petroniro's election, Musco's zoning permit was investigated by the Town Council." *Id.* at 21. Musco makes similar temporal proximity arguments with regard to other allegedly retaliatory actions, including the Mayor's letter to the PZC regarding the 2006 Ap-

proval, *id.*, ZEO Kalinowski's "refus[al] to place Musco's application for a second 30,-000 gallon tank on the PZC's agenda," *id.* at 24, and the PZC's denial of the 30K Tank and Text Amendment Applications, *id.* at 26.

However, as Musco acknowledges in its own Amended Complaint, it first sought approval to install a second 30,000 gallon tank in the spring of 2009 but withdrew the application after being notified (1) that its application was likely to be denied as a result of the Zoning Regulations' prohibition on fuel storage tanks over 10,000 gallons, and (2) that its 2006 application had been granted in error. Am. Compl. ¶¶ 49, 52. Further, Musco does not deny that, at a Town Council meeting one month prior to Petroniro's election, a local resident had appeared to complain about the 2006 approval of Musco's non-conforming storage tank. Defs.' 56(a)(1) St. ¶ 176; Pl.'s 56(a)(2) St. ¶ 176. Thus, the undisputed record makes clear that concern over the 2006 tank approval and opposition to further expansion by Musco predated Petronino's election to the Town Council. As a result, an inference of retaliation cannot be grounded on temporal proximity alone. *See Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir.2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse . . . actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

The only other evidence Musco submits to support a claim of retaliation based on Petroniro's political activity is Petronino's deposition testimony that Mayor Dunn and he "probably don't see eye to eye on a lot of things," Petroniro Dep. at 59: 17–20. The only example Petroniro provides of conflict between the Mayor and himself, however, is a dispute they had—on an unspecified date—regarding a potential

appointee to the PZC. *Id.* at 61: 7–24. According to Petroniro, the Mayor opposed his proposed appointee for the PZC, because the Mayor believed the appointee "was going to vote Petroniro's way . . . was going to get [him his] tank." *Id.* at 61: 17–18. This testimony does not support an inference that Mayor Dunn opposed Musco's expansion because Petroniro and he had political conflict. Rather, it supports an inference that the Mayor and Petroniro had political conflict because the Mayor *already* opposed Musco's expansion. Thus, it cannot give rise to a First Amendment retaliation claim based on Petroniro's protected political activity.

With respect to the issuance of the Cease and Desist Order, Musco again highlights temporal proximity, noting that the Order was issued "less than one month" after Musco appealed the PZC's denial of its 30K Tank and Text Amendment Applications. Pl.'s Mem. Opp'n at 24. Yet Musco also acknowledges that PZC members "began to aggressively question Musco and its counsel concerning Muco's alleged wholesale activity" on February 3, 2010, more than three weeks prior to Musco's filing of the appeal. *Id.* at 26. Further, Town Planner Panico's letter to ZEO Kalinowski, in which he opined that wholesale propane distribution was not permitted under the Wolcott Zoning Regulations, was dated February 11, 2012, more than two weeks prior to the filing of the appeal. Panico Letter at 1. Thus, the undisputed record makes clear that both Kalinowski's and the PZC's concerns regarding Musco's wholesaling activities predated Musco's filing of an appeal.

Musco also points to the testimony of PZC Commission Billy Olmstead in support of its contention that the issuance of the Cease and Desist Order was retaliatory. At his deposition, Olmstead was asked why he supported issuing the Cease and

Desist Order, and he gave the following response:

> Well one of the—this was my thought with that: The people at the—the public had mentioned that—asked us, you know, "He's wholesaling propane and wholesaling's not allowed." They said, "Are you guys going to do anything about that?" And so I was—and so that was the reason why we did something. I mean, it was kind of like—before that, we didn't really care, but the public complained about it and then he was—oh, okay, and then we found out that he was actually suing us, the town of Wolcott, and so I took the stance—and I think I even said this to Chairman Mahoney, I said, you know, I says, "The guy's suing the town of Wolcott," I said, "so," I says, "why give him a break? Why let him slide on something like that when he's not allowed to do it? The people are complaining about it anyway and they're asking us to stop," I said, "so why go easy on him when he's suing the town?"

Pl.'s Ex. 73 ("Olmstead Dep.") at 58:13–25, 59: 1–7. Later in the deposition, Olmstead clarified

> If it wasn't for the public calling us out on the issue, I would have never brought up the matter. I would have never brought up the matter alone, just even based on the fact that Randy Petroniro was suing us; that wouldn't have been enough reason to bring it out. It was 75 percent because the people had called us out on it.

Even if Olmstead's testimony could support a finding that Olmstead's own support of the Cease and Desist Order was "prompted or substantially caused" by Petroniro's appeal of the PZC's decision on his 30K Tank and Text Amendment Applications, nothing in the record indicates that Olmstead had any influence on the ultimate decision to issue the Cease and Desist Order. As Musco admits, ZEO Kalinowski, not the PZC, held the authority to issue the Cease and Desist Order. Defs.' 56(a)(1) St. ¶ 9; Pl.'s 56(a)(2) St. ¶ 9. Further, while Kalinowski did request input from the PZC, the record does not reveal that Olmstead ever shared his personal feelings with Kalinowski. Instead, it suggests that only Chairman Mahoney and Commissioner Zotto expressed their opinions on the issue. Mar. 22 PZC Tr. at 11: 1–5. Finally, the record demonstrates that, even prior to receiving any feedback from the PZC, Kalinowski already believed the issuance of a Cease and Desist Order was the best course of action with respect to Musco's wholesaling activities. *Id.* at 5: 22–27. In light of all of the above, the court finds that Olmstead's testimony cannot support a reasonable jury finding that Petroniro's appeal to the Connecticut Superior Court "prompted or substantially caused" the issuance of the Cease and Desist Order. *Dougherty*, 282 F.3d at 91.

Because Musco has not demonstrated that any of the defendants' adverse actions were prompted or substantially caused by either Petroniro's political activity or Musco's appeal to the Connecticut Superior Court, the court grants summary judgment in favor of each of the defendants on Musco's First Amendment retaliation claims.

### B. Equal Protection Claims

There are two types of equal protection claim available under 42 U.S.C. § 1983: selective enforcement and class of one. *Missere v. Gross*, 826 F.Supp.2d 542, 560 (S.D.N.Y.2011). Musco argues that the record supports a claim under either theory. Pl.'s Mem. Opp'n at 47. The court disagrees.

#### i. Class–of–One Claims

"A class-of-one claim exists where the plaintiff alleges that [it] has

been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir. 2010) (internal quotation marks and citation omitted). "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Town of Skaneateles,* 610 F.3d 55, 59–60 (2d Cir.2010) (alteration, citation, and internal quotation marks omitted); *see also Casciani v. Nesbitt,* 659 F.Supp.2d 427, 456 (W.D.N.Y. 2009) ("the plaintiff and [its] comparators must be prima facie identical in all relevant respects") (internal quotation marks and citation omitted). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarly in circumstances and differences in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006) (internal quotation marks and citation omitted).

■ "Generally, whether parties are similarly situated is a fact-intensive inquiry." *Id.* "A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.* The First Circuit has held that "[t]he similarly situated requirement must be enforced with particular rigor in the land-use context because zoning decisions will often, perhaps almost always, treat one landown-

er differently from another." *Cordi–Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir.2007) (internal quotation marks and citation omitted). The Second Circuit cited this passage from *Cordi–Allen* with approval in *Mattison v. Black Point Beach Club Association,* 376 Fed.Appx. 92, 94 (2010).

■ With respect to the PZC's denial of its various tank applications, Musco points to two businesses that it contends are similarly situated to it with respect to the ban on fuel storage tanks larger than 10,000 gallons. First, Musco notes that the Cumberland Farms gas station at 72 Wolcott Road received approval from the PZC to install three fuel storage tanks upon its property in 2004. Pl.'s St. Disputed Issues ¶ 162–166. Two of these tanks have a capacity of 15,000 gallons, and the third has a capacity of 10,000 gallons. *Id.* ¶ 166. Second, Musco notes that Maxum Gas Station ("Maxum") has two fuel storage tanks upon its property at 685 Wolcott Road. *Id.* ¶ 167. One of these tanks has a capacity of 12,000 gallons and the other has a capacity of 8,000 gallons. *Id.* ¶ 167. According to Maxum's owner, approval to install these tanks was granted in 2004 or 2005. Pl.'s Ex. 80 at 17: 20–21.

No reasonable juror could find that Cumberland Farms and Maxum are similarly situated to Musco for purposes of Musco's 2010 applications to the PZC, because the approvals for the comparators' non-conforming tanks were granted five to six years prior to the denial of Musco's applications. Indeed, Musco itself received approval for a nonconforming tank in 2006.

Musco adduces no evidence to suggest that, had Cumberland Farms' or Maxum's applications would have been granted had they applied to install nonconforming tanks in 2009 or 2010. *See Cordi–Allen,* 494 F.3d at 253 ("In the land-use context, timing is critical ... Courts must be sensi-

tive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate."); *Wagner v. Harmar*, 651 F.Supp. 1286, 1288 (W.D.Pa.1987) (finding that alleged comparators were not similarly situated to the plaintiff where their permits were granted "at least four years prior to the plaintiff's application being denied").

Further, there is no evidence that Cumberland Farms' and Maxum's nonconforming tanks ever met with the sort of community opposition that Musco's application engendered. *See Dutko v. Lofthouse*, 549 F.Supp.2d 187, 192 (D.Conn.2008) (finding that applications were not similarly situated where plaintiff's request to be included in a development zone met with "loud opposition from all of her neighbors," while "no residents voiced any opposition" to the alleged comparator's inclusion); *Lexjac, LLC v. Incorporated Village of Muttontown*, No. 07–CV–4614(JS), 2011 WL 1059122, at *8 (E.D.N.Y. Mar. 18, 2011) (finding that other properties were not similarly situated to plaintiff's in part because only plaintiff's had "occasioned community complaints").

▆▆ With respect to the issuance of the Cease and Desist Order, Musco points to a number of other businesses that it claims have been allowed to engage in wholesale operations with impunity. These include Maxum, Raymond's Lumber, Sandy's Television and Appliance, Sullivan Brothers Cabinets, Party Plus, and Gaudiosi Garbage. Pls. St. Disputed Issues ¶ 158. The court first notes that the record does not support a finding that Maxum engages in wholesale operations, at least not as defined by ZEO Kalinowski and the PZC.[3] While Maxum's owner states in an affidavit that the business engages in "both the retail and wholesale sale of fuels," Pl.'s Ex. 80 at 1, his deposition testimony suggests that he defines "wholesale" business as encompassing sales to any commercial customers who buy large quantities of gas, rather than sales to customers who resell that gas to end users, *id.* at 30–32.

As for the other businesses named by Musco, they are not similarly situated for purposes of the Cease and Desist Order because they do not engage in wholesale distribution of *heating fuel or natural gas.* ZEO Kalinowski never contended that wholesaling of any kind was prohibited under the Wolcott Zoning Regulations. Instead, he asserted that the Zoning Regulations prohibited the wholesaling of heating fuel and natural gas. *See* Cease and Desist Order at 1–2. Thus, it is entirely unsurprising that Kalinowski never issued Cease and Desist Orders to companies engaged in the wholesale distribution of lumber or party supplies, and Kalinowski's failure to do so does not suggest that Musco was singled out for unequal treatment.

Because no rational juror could find that Musco is "prima facie identical in all relevant respects" to its purported comparators, *Casciani,* 659 F.Supp.2d at 456, Mus-

---

**3.** The court uses the definition of "wholesaling" adopted by ZEO Kalinowski and the PZC—i.e., selling a product to another company which then resells the product to an end user—because it views their interpretation as reasonable given the Zoning Regulations' provision that words not otherwise defined "shall have the meaning commonly attributed to them." Zoning Regs. at p. I–5. Whether the interpretation was correct, as a matter of state law, is irrelevant to Musco's equal protection claims. *See Bizzarro v. Miranda*, 394 F.3d 82, 88 (2d Cir.2005) ("The pertinent question in a constitutional claim is not whether the defendants correctly understood the rules they were enforcing.").

co cannot prevail on its class-of-one equal protection claims.

### ii. Selective Enforcement Claims

■■■ To establish a selective enforcement claim, a plaintiff must prove that, "(1) in comparison with others similarly situated, [it] was selectively treated, and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir. 1980)). Courts in the Second Circuit are split as to whether the "extremely high degree of similarity" standard articulated for class-of-one claims also applies to selective enforcement claims. *Missere,* 826 F.Supp.2d at 561 (collecting cases). A number of courts have applied a lower standard, requiring the plaintiff only to show that it and its comparators "are similarly situated in all material respects, or that a prudent person looking objectively at the incidents would think them roughly equivalent." *Id.* (internal quotation marks and citations omitted). For the same reasons discussed in the context of Musco's class-of-one claims, the court finds that all of Musco's purported comparators fail to meet even this less demanding standard of similarity.

■■■ Further, even if Musco could establish that the other businesses it names were similarly situated for selective enforcement purposes, it has not proffered evidence sufficient to support a finding that its selective treatment "was based on impermissible considerations." *Diesel,* 232 F.3d at 103. First, to the extent that Musco claims that the defendants singled it out for unequal treatment in retaliation for Petroniro's political activity or Musco's filing of an appeal in Connecticut Superior Court, its selective enforcement claims "coalesce" with its First Amendment retaliation claims, which the court has already rejected. *See Cobb v. Pozzi,* 363 F.3d 89, 110 (2d Cir.2003). Second, Musco has failed to adduce evidence—beyond Petroniro's assertion that Mayor Dunn and he "really don't like each other," Petroniro Dep. at 59: 24—that would support a rational juror's finding that the defendants' conduct was motivated by more generalized malice or personal animus toward Petroniro. At best, the record suggests that the defendants were hostile towards Musco's business activities, but such use-directed hostility cannot support an equal protection claim. *See Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 503 (2d Cir.2001) ("Enmity directed toward a business property use may not form the basis for a constitutional claim because equal protection rights vest in individuals rather than business activities.").

Because Musco has failed to establish a disputed issue of material fact under either the class-of-one or selective enforcement standards, the court grants summary judgment in favor of each of the defendants on Musco's equal protection claims.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motions for Summary Judgment (Doc. Nos. 103, 104, 105, 108, 110, 111, 112 & 113) are granted, and the defendants' Motions to Disqualify Plaintiff's Experts (Doc. No. 106, 107 & 109) are denied as moot.

**SO ORDERED.**